317 So.2d 715 (1975)
Tony WATTS
v.
STATE of Mississippi.
No. 48646.
Supreme Court of Mississippi.
August 25, 1975.
Dale & Upton, Columbia, for appellant.
A.F. Summer, Atty. Gen., by Wayne Snuggs, Special Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, INZER and SUGG, JJ.
PATTERSON, Justice.
Tony Watts was convicted of armed robbery by the Circuit Court of Marion County. *716 He was sentenced to twenty years in the state penitentiary and now appeals.
The assignments of error for reversal are: The trial court erred (1) in overruling the defendant's motion to quash the jury panel because Negroes had been deliberately and systematically excluded from jury duty by peremptory challenges of the state, and (2) in overruling the defendant's motion for a directed verdict at the conclusion of the state's case in chief.
The first assignment of error is without merit since no evidence of consistent or systematic exclusion of Negroes was presented by the movant. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).
The next assignment presents a difficult question due to the posture of the appeal. The appellant restricts himself to the contention that the lower court erred in overruling his motion for a directed verdict at the conclusion of the state's case in chief. In doing so, he overlooks the many cases from this Court which hold that a motion for a directed verdict is waived when the movant introduces evidence in his own behalf. Fields v. State, 293 So.2d 430 (Miss. 1974); Hankins v. State, 288 So.2d 866 (Miss. 1974); Freeland v. State, 285 So.2d 895 (Miss. 1973); Smith v. State, 245 So.2d 583 (Miss. 1971); Ross v. State, 234 Miss. 309, 106 So.2d 56 (1958); and other similar cases too numerous to cite. The reason underlying the rule is that the evidence of the defense is considered in conjunction with that of the prosecution which may have the effect of either strengthening or weakening the state's case, but in any event, there is additional evidence for consideration, moving the fact-finding process from only the evidence of the state to the totality of the evidence.
In view of the rule mentioned, this case might be affirmed without further ado since the defendant offered evidence in his own behalf. However, a review of all of the evidence, and noting the defendant requested a peremptory instruction, and in his motion for a new trial contended the verdict was contrary to the evidence, dictates consideration of the entire case in order to accord with due process of law.
On the evening of August 31, 1974, Constable McKenzie had Tony Watts under surveillance. His interest in Watts was incited by tales that Watts was selling beer. Armed with this information and a pair of field glasses, he parked in front of a nearby liquor store and observed Watts' place of business described as "a little old joint down there that he runs that had a pool table and a juke box in it." Thus situated, he saw someone come out of the "joint" with a sack in his hands. This motivated McKenzie to unobtrusively move from the liquor store to Watts' "joint." From the street he was able to discern within the lighted interior a beer can upon a table. After parking his car and entering the "joint," he discovered the beer can had been removed from the table to a bar "about as high as a judge's bench." The can was obtained by the constable and under scrutiny was revealed to be a 16-oz. Schlitz can about half full of beer. This discovery triggered, in the name of the law, the following: A search of a refrigerator behind the bar (nothing found), a search of an adjoining bedroom (nothing found), a search of a second refrigerator in the bedroom (nothing found), and finally, a search of a garbage can under the bar where there was discovered an unopened can of Schlitz beer and two empty cans, all cold.
As Officer McKenzie started to leave with the confiscated beer, Watts asked what he was going to do with it and was advised that he was going to pour it out. Watts objected because it was the last beer that he had. This interested a bystander who volunteered the statement that the constable had no right to take the beer, to which the constable responded: "I don't *717 need a search warrant. When I see beer in plain view in a public place I don't need a search warrant to search the building," admonishing, "If you don't hush, I'm going to charge you with interfering with a law officer." Evidently encouraged by the voice of an ally, Tony repeated: "You can't take that beer. That's the last one I got." Whereupon the constable retorted: "Well, Tony, since you put it that way, I was trying to save you $65.00... . You're under arrest. You can go with me too." The saving of $65.00 was later explained by the constable that he had intended to pour the beer out and warn Tony about possession of beer.
The dialogue reached heated intensity when the constable insisted that Tony was going to jail and Tony adamantly refused the invitation. The conversation was abruptly terminated when McKenzie placed one of the cans on the table and reached for Tony, and, according to McKenzie, Tony pulled a pistol and pointed it under his chin causing him to move his hand away from his own pistol which was taken by Tony who then directed the constable to leave the premises. To this command McKenzie retorted that he would not leave without his pistol.
Desirous of terminating the impasse, there followed a discussion of some duration (approximately ten minutes) as to the disposition to be made of the constable's pistol after their departure. Tony stated that he would leave it outside the back door. The constable objected, stating that he did not want his gun thrown out in the rain. Tony suggested that he would leave it at Mammie Morris' (Miss Toot's), a nearby residence; whereupon the constable importuned Tony not to leave the gun there, but to come with him and avoid trouble. At this juncture Tony ran out the back door into the darkness, stumbled over a bicycle, struck a clothesline, recovered, ran nearly five miles through the woods, waded the river and finally arrived at his sister's home. Later in the morning he called the county sheriff, advising him of his whereabouts and requested him to come pick him up. The sheriff arrived shortly thereafter at which time the pistol was delivered to him and Tony was brought to jail.
Meanwhile, McKenzie rearmed himself and searched for Tony, but abandoned the project at about 2:30 in the morning, contenting himself thereafter by charging the escapee with possession of beer, resisting arrest, pointing and aiming a deadly weapon, assault and battery with intent to kill, and armed robbery. Fortunately, the issue before us is limited to armed robbery and one of its essentials, the intent to permanently deprive the owner of his property.
In Thomas v. State, 278 So.2d 469 (Miss. 1973), we repeated our former holdings that: "Under the law intent to steal is an indispensable element of robbery," and "that where the property of another is taken with an intent to return it to the owner, the taking is not with `intent to steal' and is not larceny." (278 So.2d at 472). The issue of whether there is intent is for determination by a jury. See Williams v. State, Miss., 317 So.2d 425, decided August 4, 1975, not yet reported.
The appellant's testimony coincides with that of the constable to a great extent, the discrepancy, if it be such, being noted from the following language of the parties:
Q. He told you you'd get your gun back, didn't he?
A. Well, sir, he told me I could get it back that he would leave it outside the door first and I told him to lay my gun down and he said he would leave it at Mammie Morris's house, but he didn't.
Q. It wasn't his intention to keep it, was it?
A. Yes, sir.
Q. If he told you he would leave it outside how do you arrive at that conclusion?

*718 A. Well if it wasn't his intent he wouldn't never took it. That is my belief of it. I begged him to give it back to me.
Somewhat contrary to this Tony testified:
Q. What was your intent with reference to the gun?
A. Just take it from him to keep him from shooting me. He was mad and I didn't want him to shoot me and I knowed I didn't want to do nothing to him and I didn't want him to do nothing to me so I just took his pistol and left. That's the reason I took it and left.
Q. What was your intent to do with his pistol?
A. I was intending to leave it on the outside.
He testified further that when he left, he was excited and frightened and forgot to leave the pistol at Miss Toot's, but later returned it to the sheriff.
From this evidence which we have portrayed as favorably for the state as the record permits, we are unable to find a scintilla to support the jury's verdict that the appellant intended to steal or otherwise permanently deprive Constable McKenzie of his pistol. The evidence indicates that Tony took the pistol to make his escape and the issue was not whether it was to be returned, but rather where it was to be returned, indicative certainly of wrongdoing, but surely not proof of an intent to steal. We conclude the court erred in refusing the defendant's request for an instruction of not guilty at the conclusion of all of the evidence.
Reversed and defendant discharged of the crime of armed robbery.
GILLESPIE, C.J., RODGERS, P.J., and SMITH, ROBERTSON and WALKER, JJ., concur.
BROOM, J., took no part.