402 So.2d 830 (1981)
Eddie Jerome TUBBS
v.
STATE of Mississippi.
No. 52732.
Supreme Court of Mississippi.
August 12, 1981.
*831 J. Richard Barry, Thomas L. Webb, Bourdeaux & Jones, Meridian, for appellant.
Bill Allain, Atty. Gen. by Robert D. Findley, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and SUGG and BROOM, JJ.
SUGG, Justice, for the Court:
Eddie Jerome Tubbs was convicted in the Circuit Court of Lauderdale County for the capital murder of Hubert Marshall Brand and sentenced to life imprisonment. One of the nine assignments of error is that the verdict of the jury was against the overwhelming weight of the evidence.
On September 17, 1979, Brand's body was found in a trash dump about eight miles west of Meridian, Mississippi. Brand had been severely beaten on his head, neck, shoulders and abdomen. An autopsy was performed on September 18 by Dr. Gonzales, a forensic pathologist. His examination revealed fractured bones in the head, neck and chest, contusion and bruising of the anterior portion of the heart, and hemorrhaging in the abdominal area due to a laceration of the liver. The doctor also found evidence of manual strangulation. The doctor testified that either the head trauma, the chest trauma, abdominal trauma or the manual strangulation could have singly caused the death of Brand. The autopsy was performed at about 8:00 p.m. on September 18 and in the opinion of the pathologist, Brand's death occurred approximately 72 hours earlier.
Brand was an automobile salesman, employed by Nelson Hall Chevrolet in Meridian. He was seen leaving his place of employment between 5:00 and 5:30 p.m. on September 15 in a green Chevrolet Impala bearing a dealer tag. At approximately 5:30 p.m., two witnesses saw him drive into *832 the parking lot of a Burger Chef Restaurant accompanied by a young black male who ordered some food. Both witnesses identified the black male as Tubbs and stated that, as the car left the parking lot, they observed that it had a dealer's tag on it.
Tubbs returned to his home in Meridian where he lived with Lynda Arrington, Leon Harrison and Angie McCoy during the early evening hours of September 15. Harrison and McCoy both stated that Tubbs had in his possession a brown three-fold wallet, some Nelson Hall business cards, a drivers license, a silver digital watch and a small amount of cash when he arrived at his home. Both witnesses heard the defendant say he had beaten a man and taken his car somewhere outside Meridian and they saw Tubbs burning something on the back steps of their home later. The following day McCoy found the remains of what appeared to be a wallet and some Nelson Hall business cards when she swept the back steps. When Tubbs left his home the night of September 15, Harrison and McCoy both stated he departed in a green Chevrolet Impala bearing a dealer's tag. Brand's wife testified her husband owned a brown three-fold wallet and a silver digital watch.
Tubbs returned home early Sunday morning, September 16. His girlfriend, Lynda Arrington, noticed an unfamiliar automobile in front of the house and asked Tubbs who was driving the car. He replied that he was. Later in the morning he drove her to work in the same automobile, a green Chevrolet Impala bearing a dealer's tag, and she saw a plaid jacket on the floorboard of the automobile when she entered it. Three other witnesses said they saw Tubbs late Sunday night driving a light colored Chevrolet Impala bearing a dealer tag.
The following morning, September 17, Lynda Arrington awoke to find Tubbs sitting on the couch looking at some check books which had the initials H and B on them. Before leaving, Tubbs put the check books in a paper bag and placed them under the couch. After he left, Arrington heard on a television newscast that Hubert Brand was missing and had been wearing a plaid jacket at the time of his disappearance. Remembering the plaid jacket which she saw in the automobile, she got the check books from underneath the couch and found the name of Hubert Brand on them. When Tubbs returned she confronted him with these facts, a heated argument followed, and Tubbs left the house.
Brand's automobile was found on the morning of September 19 directly across the street from the home of Tubbs, Arrington, Harrison and McCoy. One latent fingerprint was lifted from the inside of the door jamb where the right rear door closes on the post of the automobile, and was identified as being the fingerprint of Tubbs. Other fingerprints were found on the automobile but were not identified.
The following handwritten note was introduced in evidence:

The note was discovered under rather unusual circumstances. When the officers found the body of Brand on September 17, Adolph Harris was slumped over in the front seat of his automobile at the trash *833 dump. The rear of Harris' automobile was about ten feet from Brand's body. Harris told the officers that he backed his car into the area, and while standing at the rear of his automobile saw a pair of glasses on the ground. He picked the glasses up, placed them in the trunk of his automobile and it was subsequently determined that the glasses belonged to Brand. Harris was arrested and charged with the murder of Brand. On September 21 a habeas corpus hearing was held in the courthouse and about the noon hour a South Central Bell envelope was found on the steps of the Lauderdale County Courthouse. The envelope and its contents were carried to the Sheriff's office and contained the note that was introduced in evidence along with other items belonging to Brand. The envelope and its contents were introduced in evidence.[1]
The handwriting expert from the Mississippi Crime Laboratory testified that, in his opinion, both the note and the handwriting on the South Central Bell envelope were in the handwriting of Tubbs. He testified he reached this conclusion by comparing the note with known specimens of Tubbs' handwriting which consisted of a statement written by Tubbs to his parole officer and two notes written by Tubbs while he was in jail. Tubbs was ordered by the court to furnish the state a handwriting exemplar. He refused to comply with this order, so it was necessary for the state to introduce and rely on the three known exemplars of Tubbs' handwriting.
The defendant did not testify but presented three witnesses who said they saw him at the Hole in the Wall Club in Meridian on the night of the murder. One witness arrived at the Club about 7:30, another about 7:45 and another about 8:00, and they stated that they were in the presence of the defendant at the club from the time they arrived until about midnight. He also offered Larry Covert, a Meridian policeman, as a witness. Covert testified that he saw Brand alone in a light green Chevrolet that was a "dealer car" between 5:00 and 8:00 p.m. on September 15. He observed Brand leave his gasoline service station and proceed west on Eighth Street. He stated that he gave the police a statement that he saw Mr. Brand between 7:30 and 8:00 p.m. and on cross-examination, said he told the secretary at the detective bureau he saw Mr. Brand between 7:30 and 8:00 because she said she needed a time.
Defendant contends that a verdict of the jury was against the overwhelming weight of the evidence. Tubbs' contention on this point may be summarized as follows: (1) no one saw him kill Hubert Marshall Brand; (2) he was not seen at the place where Brand's body was discovered; (3) the evidence did not rule out the possibility that the fingerprints found on the right rear door post of Brand's car were put there on Sunday, September 16, one day after Brand's death; (4) there was no evidence other than the questionable testimony of Harrison and McCoy that he had killed anyone; (5) there was no evidence presented that would prove he was guilty of robbery other than the fact that he was in the victim's car and had in his possession some of the victim's business cards and checks; (6) that a police officer saw Brand alive after the time his alibi witness testified they were with Tubbs at a club in Meridian; *834 (7) a white male, Charles Warren, could not be found to testify at the trial. (Warren had led law enforcement officers to the scene where the body was found where Warren and the victim had previously gone to have homosexual relations. Tubbs argues that Warren's absence, combined with the fact that Brand had been robbed before at the place where his body was found, should have created some doubt in the minds of the jury.) (8) All of the above facts, coupled with law enforcement officers finding Adolph Harris slumped in the seat of his car with the lights out, ten feet from the victim's body, with the victim's glasses in the trunk of his car, with Harris claiming he was reading a dog racing form and preparing to go treasure hunting, points the finger of guilt in other directions.
Tubbs then argues that, assuming everything testified by the state's witnesses is true, there still remains a reasonable hypothesis that some person other than he killed Brand; therefore, the verdict of the jury is against the overwhelming weight of the credible evidence and the case should be reversed.
The evidence for the state may be summarized as follows: (1) Hubert Brand left his place of employment between 5:00 and 5:30 p.m. on September 15 in a light green Chevrolet Impala bearing a dealer's tag; (2) Tubbs and Brand were seen at a Burger Chef together shortly thereafter and drove off in an automobile bearing a dealer's tag; (3) Tubbs returned to his house about 7:00 to 7:30 p.m. on September 15 and was seen by Harrison and McCoy, who lived in the house, in possession of a brown trifold wallet, Nelson Hall Chevrolet business cards, a drivers license, a silver digital watch and a small amount of currency; (4) Brand was a salesman for Nelson Hall Chevrolet, owned a brown trifold wallet and a silver digital watch; (5) upon returning home Tubbs told Harrison he had beaten up a car dealer and taken his car earlier that night and explained he thought the man had money; (there was only $7.00 in cash among the personal effects lying on the bed beside Tubbs when he made these statements) (6) although these remarks were addressed to Harrison, McCoy, overheard the conversation; Tubbs burned some articles on the back steps and the remains of a wallet and business cards were found by McCoy the next morning; (7) Tubbs left driving a new light green Chevrolet bearing a dealer's tag; (8) Tubbs' girlfriend, Lynda Arrington, saw Tubbs in possession of check books with the name Hubert Brand on them; (Tubbs carried Arrington to work in a Chevrolet Impala bearing a dealer's tag with a plaid jacket on the floorboard of the automobile; (Brand owned a plaid jacket)[2] (9) Tubbs' fingerprints were found on the automobile which Brand was driving the night he disappeared; (10) the handwriting on the outside of the envelope and a note in the envelope found at the courthouse on the day the habeas corpus hearing was held involving the initial suspect in the case was identified as Tubbs'.
This is a circumstantial evidence case and it is well established that in circumstantial evidence cases, it is necessary for the State to prove the guilt of the defendant not only beyond a reasonable doubt, but also to the exclusion of every other reasonable hypothesis consistent with his innocence. Sanders v. State, 286 So.2d 825 (Miss. 1973). See also cases in Mississippi Digest, Criminal Law, Key Number 552(3).
Tubbs' defense was an alibi and it is well established that a jury is not under a duty to accept an alibi defense, but must consider all of the testimony in determining the guilt or innocence of an accused. An alibi defense presents a question of fact to *835 be resolved by the jury. In Spikes v. State, 302 So.2d 250 (Miss. 1974), we stated:
The jury was not required to accept this alibi. Its duty was to evaluate the testimony of the witnesses for the State and defendant, and to determine whether the evidence showed beyond a reasonable doubt that appellant was guilty. The State's evidence was contradictory of that of appellant concerning an alibi. It was a jury issue. Newton v. State, 1956, 229 Miss. 267, 90 So.2d 375. (Kelly v. State, 239 Miss. 683, 690, 124 So.2d 840, 842 (1960). (302 So.2d at 251)
Accord, Johnson v. State, 359 So.2d 1371 (Miss. 1978.)
The evidence presented a typical case to be determined by the jury, on conflicting facts. The state presented a strong circumstantial evidence case, and we are of the opinion that it was sufficient to prove the guilt of Tubbs, not only beyond a reasonable doubt, but also to the exclusion of every other reasonable hypothesis consistent with his innocence. We hold the verdict of the jury was not against the overwhelming weight of the credible evidence.
At the conclusion of the State's case, Tubbs moved to exclude the evidence and direct a verdict of acquittal as to the underlying charge of robbery, and assigns as error the action of the trial judge in overruling his motion. After the motion was overruled Tubbs presented evidence in an attempt to establish an alibi defense and is thereby precluded from raising any issue on appeal with regard to the denial of his motion for a directed verdict. Lucas v. State, 381 So.2d 140 (Miss. 1980); Watts v. State, 317 So.2d 715 (Miss. 1975); Hankins v. State, 288 So.2d 866 (Miss. 1975).
Although Tubbs may not raise this issue on appeal, the evidence was sufficient to withstand the motion for a directed verdict.
Appellant also contends that reversible error was committed when Deputy Sheriff Ernest Jackson stated that Randy Eakes was a parole officer. Tubbs filed a motion in limine to prohibit the State from making reference to any prior criminal record of the defendant unless the defendant testified in his own behalf. When the motion in limine came on for hearing, the trial judge stated that the state would be allowed to impeach Tubbs by showing prior convictions only if Tubbs took the stand. When the witness Jackson was testifying, the following question was propounded to him, and he gave the following answer:
Q. Officer Jackson, I'm going to hand you some items; first, Exhibit A and Exhibit B marked for identification only, and ask you if you can identify that item?
A. Yes. One sheet is a voluntary statement and the other one is a rights form that was received from Randy Eakes, Parole and Probation Officer.
There was no objection made to this potentially prejudicial testimony. It has long been the rule that we confine ourselves to objections made to evidence in the trial court, regarding all other objections as waived. This was enunciated in McComb v. Turner, 22 Miss. 119, 14 S. & M. 119 (1850) and has been followed in numerous cases since that time.
It is also apparent that, when the witness identified Randy Eakes as a parole officer, his answer was not responsive to the question asked by the State's attorney. We do not consider an unresponsive answer of a witness as an attempt to violate the ruling of the judge on the motion in limine.
Randy Eakes was later called as a witness, and as previously instructed by the court out of the presence of the jury, made no reference to Tubbs' status as a parolee. There was no attempt on the part of the State to elicit from Eakes either his occupation or his relationship with Tubbs.
Tubbs also argues under this assignment of error that the voluntary statement given by him to Eakes and used by the state as a handwriting exemplar made reference to a previous offense. This argument is not well founded because all language pertaining to a warrant for a previous offense was excised before the statement *836 was introduced in evidence.[3] For the reasons stated, we find no merit in this assignment of error.
Tubbs assigns as error the admission of two black and white photographs showing Brand's body when it was found. Tubbs contends the photographs were cumulative of other evidence, had no probative value, and were used only to inflame the jury. The mere fact that a photograph may be cumulative of other evidence does not extinguish its probative value. 3 Wharton's Criminal Evidence, § 637, p. 289, (Thirteenth Edition, Torcia (1973). The photographs showed Brand's pockets were turned out thereby indicating Brand was robbed, they were not particularly gruesome; therefore, we hold they were relevant and the trial court did not abuse its discretion in allowing the photographs to be admitted in evidence.
Tubbs assigns as error the failure of the trial judge to provide funds to enable him to employ a fingerprint expert and a questioned documents expert. He argues that if his motion to hire these experts had been granted, the fingerprint expert might have identified the other fingerprints found on Brand's car, and another questioned documents examiner might have reached a different conclusion than that reached by the expert who testified for the State.
When the motion came on for hearing, the trial judge advised counsel:
The experts  until the legislature acts, I do not feel that I can make new laws or spend money without authority, but I will try to see to it that your client has the benefit of an expert if it will help, in my judgment, get to the truth of the issues here, the important issues in this trial. You will have to submit me the name of the expert, bring him here, and let me have some interview with him. I just won't allow you an access to spend money without an additional order.

Tubbs relies on Bradford v. U.S., 413 F.2d 467 (5th Cir.1969), in which the Court stated:
The government's case against Washam depended almost entirely upon the testimony of the two experts. It was therefore necessary, if Washam was to combat this evidence, that he have the assistance of other handwriting and fingerprint experts.
... .
We believe that since expert testimony could have been decisive on all counts the error taints the entire case. (413 F.2d at 474, 475)
We hold that no reversible error was committed by the trial judge for two reasons. First, in Bradford, the court held that expert testimony could have been decisive on all counts. This is not true in the case before the Court. We therefore distinguish Bradford factually because the State's case did not depend almost entirely upon the identification of Tubbs' handwriting and fingerprints. The State presented a strong case by its other evidence which would have been sufficient to sustain the verdict of the jury even if the fingerprint and handwriting evidence had been omitted.
Second, we interpret the ruling of the trial judge to mean that he would have provided the necessary experts for the defendant if counsel had complied with the request of the judge to submit the names of experts to him and let the court interview them. The defendant did not submit any names of experts, did not provide the court the opportunity to interview experts, so he is in no position to put the trial judge in error.
Tubbs assigns as error the refusal of the trial judge to sustain his pretrial motion to empanel separate juries for the guilt and sentencing phases of his trial. This question has been settled adverse to the contentions of Tubbs in Jackson v. State, 337 So.2d 1242 (Miss. 1976). See also section 99-19-101 Mississippi Code Annotated (1977 Supp.).
*837 Tubbs also argues under this assignment of error that he should have been given twenty-four (24) peremptory challenges rather than the twelve (12) permitted by section 99-17-3 Mississippi Code Annotated (1972). If Tubbs had been granted a separate jury for the sentencing phase of the trial, he would have been entitled to additional peremptory challenges; however, since the jury tried both phases of the bifurcated trial, only twelve (12) challenges were authorized.
Tubbs assigns as error the failure of the trial judge to appoint co-counsel earlier than fifteen (15) days before his trial. On May 6, 1980, the trial judge denied the motion for appointment of co-counsel and stated:
That J. Richard Barry is a licensed, practicing attorney having graduated from the University of Mississippi; he is a member or an associate of the law firm of Bourdeaux & Jones; and also, associated with Thomas  Attorney Thomas Webb of that firm, Bourdeaux, Jones & Webb, maybe, and Mr. Hammack, and counsel has been observed by the court since his graduation from the University of Mississippi, been observed by the court in his native county of Clarke while he was still in high school, and while attending the University of Mississippi Law School he worked as a part time Deputy Sheriff in Clarke County. He is an able young man; he knows how to investigate criminal cases, or investigate cases. Let the record reflect that he has raised most every conceivable point in his motions at this time, filed for and on behalf of Eddie Jerome Tubbs and I feel that Eddie Jerome Tubbs has an excellent attorney, one that is able to represent him and see that he gets a fair and impartial trial. And if it comes down to the trial of the case, I will allow you to renew your motion at any time I feel that due, maybe, to a lack of experience in the courtroom, you do need co-counsel, but I have not observed that as of this point, and your motion is denied as of now.
On June 3, 1980, the motion was renewed and the court appointed Thomas Webb as co-counsel after ascertaining that he was the attorney Tubbs wanted to act as co-counsel. The trial of defendant began on June 18, 1980, and both attorneys represented him at the trial. Accordingly, we hold that the trial judge did not commit error by failing to appoint co-counsel more than fifteen (15) days before the trial date.
Tubbs alleges as error the trial court's failure to grant his motion for a change of venue because of the publicity surrounding Brand's murder.
The trial judge reserved his decision on the motion until voir dire of the jury had been completed. Thus,
The trial judge in the case at bar had the opportunity to view the prospective jurors, watch their demeanor and form an opinion as to whether or not a fair trial could be given in the county. Parks v. State, 267 So.2d 302, 304 (Miss. 1972).
Furthermore, of the thirteen (13) witnesses presented by the defendant on the motion for a change of venue, eight (8) thought he could get a fair trial, and of the five (5) remaining, only two (2) consistently held to their original statements made on direct examination that the defendant could not get a fair trial. The State offered witnesses who were of the opinion Tubbs could get a fair trial. The rule in such situations was established by this Court in Shelton v. State, 156 Miss. 612, 126 So. 309, 393 (1930).
Where the testimony is to the effect that the people of the county have not prejudged the defendant's case, and that there is no prejudice against the accused, and the voir dire examination of the prospective of the jurors shows that a fair proportion of the jurors of the county are qualified for service in the case, it is not error for the trial judge to overrule a motion for a change of venue.
The trial judge carefully exercised his discretion and properly held that pretrial publicity would not prevent Tubbs from obtaining a fair trial in Lauderdale County.
*838 Finding no reversible error, we affirm.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ. and WALKER, BROOM, LEE, BOWLING and HAWKINS, JJ., concur.
NOTES
[1] This exhibit consists of a South Central Bell Telephone Co. envelope containing a cash ticket from J.C. Penney Co., Inc.; a Neiman-Marcus credit charge in the name of Mr. Hubert Brand; a Merchants & Farmers Bank card, No. 073 216 6 in the name of Mr. or Mrs. Hubert M. Brand; a membership card, Fraternal Order of Police, Associate Member in the name of Hubert Brand; a Social Security Card, Account No. 427 32 0782, in the name of Hubert Marshall Brand; a Registration Certificate to vote in the name of Hubert M. Brand, No. 1696; an identification card from American Fidelity Assurance Co., Account No. 1103727 in the name of Hubert M. Brand; a Nelson Hall Chevrolet card with the name of Hubert M. Brand on it and a home phone number and an officer phone number; a Veterans of Foreign Wars membership card in the name of Brand, Hubert M., No. 3973330, Post 79; a State of Miss. Driver's License, No. XXX-XX-XXXX, in the name of Brand, Hubert M.; check No. 087 on account of Mr. or Mrs. Hubert M. Brand, made payable to (blank) in the amount of $230.00, dated 9/14/79, for carpenter's work and has a signature, Mrs. Hubert Brand on the bottom of it.
[2] Tubbs did not testify, and the only explanation of the unusual manner in which he obtained the automobile and the check books of Brand was elicited from the State's witness, Lynda Arrington. She said Tubbs told her he got the automobile from a man named Youngblood in Toomsuba. She did not find any Youngbloods listed in the Toomsuba telephone directory, and when she confronted Tubbs with this fact, he changed his story and said a dealer from Nelson Hall let him "try the car out." She further said Tubbs told her a "guy" named Fly threw the check books at him out of a car.
[3] The following was excised from the statement: "I put the curtins over them and went back to the house about 1 hour or half the police come with a warrent for larncy."