# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01165-COA

**DEVON DEUNATE ODOM A/K/A DEVON ODOM**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

DATE OF JUDGMENT:            03/15/2023
TRIAL JUDGE:                HON. ADRIENNE ANNETT HOOPER-WOOTEN
COURT FROM WHICH APPEALED:  HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:     OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL BY: KATY TAYLOR SARVER
DISTRICT ATTORNEY:          JODY EDWARD OWENS II
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 12/16/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. Following a jury trial, DeVon Odom was convicted of first-degree murder and armed robbery. On appeal, Odom argues that the jury was not properly instructed concerning the issue of self-defense and that the evidence was insufficient to support his conviction for armed robbery. We find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. In October 2019, Jessica Barnes was dating DeVon Odom. Barnes and Odom had one child together, and Barnes was pregnant with a second child. On the weekend of October

23-24, 2019, Barnes planned to attend homecoming events at her former high school with two long-time friends, Dontavious Cooper and Keanu Jackson. On the evening of October 23, Cooper, Jackson, and Barnes met at Barnes's house. Odom was also present. Jackson testified that Odom was smoking "spice." The group decided to cook chicken tetrazzini for supper, and Odom went to the grocery store to buy the ingredients. When Odom did not immediately return, Jackson and Cooper left to visit other friends.

¶3. Jackson and Cooper returned to Barnes's house and then left again to visit other friends. Jackson testified that by around 1:30 a.m., he and Cooper had returned to Barnes's house, but Odom still had not returned. Barnes was in her bedroom, and Jackson and Cooper had lain down on couches in the front room to try to go to sleep. Around 2 a.m., Odom returned to the house and went into Barnes's bedroom.[1] Barnes testified that Odom was "agitated" and "upset," and she could tell that he was high because his eyes were bloodshot. Odom first demanded to know "who had been in the house" and then asked Barnes to take him to his mother's house. Barnes refused to take Odom to his mother's house and returned to bed. She testified that Odom went back to the front room.

¶4. After Barnes lay down, her stomach "started cramping real bad," so she went to "the front room and asked for somebody to take [her] to the hospital." Cooper offered to take her to the hospital, which angered Odom. Odom "jumped up" and demanded to know what was "going on" between Cooper and Barnes. Barnes assured Odom that "nothing like that" was

---

[1] Barnes testified that sometime after 2 a.m., she realized that Odom, Jackson, and Cooper were all outside sitting in or standing by her van. She testified that she was "frustrated" that they were all still outside at that time of night, and Odom followed her back inside to her bedroom.

going on, but Odom "was just adamant that something was going on between [Barnes] and [Cooper]." Barnes then decided not to go to the hospital and went back to bed.

¶5.     When Barnes returned to her bedroom, she "started to hear what sounded like furniture moving around" in the front room or "rumbling" and "wrestling." Next, she "heard a gunshot." She ran back to the front room and saw Cooper "on the couch ducking while [Odom] was shooting a gun." Barnes said that Cooper "was crouching" on the couch "like he was trying not to get hit." Barnes screamed at Odom to "stop shooting" and ran to Cooper. Cooper had a large "gash" on his head and a gunshot wound to his side.[2] Barnes tried to apply pressure to the gunshot wound. At some point, Barnes noticed that Odom was holding Cooper's gun, which Cooper had worn "on his side" earlier in the evening.

¶6.     Barnes testified that Odom would not let her or Jackson call 911 or take Cooper to the hospital. Odom insisted that Cooper was "fine" and that Barnes and Jackson could not leave. Barnes and Jackson "begged and begged" Odom to let them take Cooper to the hospital, but Odom pleaded with Barnes not to "send [him] to prison." After Barnes assured Odom that she would not "send [him] to prison," Odom finally relented and allowed her to take Cooper to the hospital. Barnes estimated that Odom held her and Jackson "at gunpoint" in the front room for about thirty minutes before he finally allowed them to take Cooper to the hospital. Cooper died at the hospital from his gunshot wounds.

---

[2] The medical examiner testified that Cooper had two distinct blunt force or "laceration" injuries to his head and three distinct gunshot wounds. Cooper had an entrance wound and an exit wound in his left arm. There was also an entrance wound in Cooper's left side; that bullet went through Cooper's chest wall, chest cavity, left lung, diaphragm, abdominal cavity, and aorta. Finally, there was a "graze wound" to Cooper's left foot.

¶7.     Jackson testified that after Odom returned to the house and went to Barnes's bedroom, Odom and Barnes began arguing loudly. Jackson was concerned about Barnes, so he got up and went to the restroom to try to hear the argument. Jackson heard Barnes say to Odom, "Well, why don't you ask him yourself." Jackson "heard footsteps moving towards the front room and then . . . heard a gunshot." He did not hear any words exchanged between Odom and Cooper. Jackson ran and met Barnes at the doorway to the front room and watched as Odom stood over Cooper and shot him again. Jackson testified that Odom shot Cooper with a .22-caliber revolver that belonged to Odom. Cooper was still in the same position, "half asleep" and reclining on the couch, as when Jackson had gone to the restroom moments earlier. Odom turned to Barnes and Jackson and yelled, "[Y]'all didn't tell me he had a gun." Cooper's gun was still in Cooper's waistband at that point. Odom took Cooper's gun and put it in his own waistband. Jackson started to call for an ambulance, but Odom said, "No, you're not going to call anyone." Odom then took Jackson's phone and Cooper's phone. Odom was still armed and "kept stating that he was not fixing to go to jail for this." Odom also said he did not know whether he should kill himself or kill Jackson and Barnes. Odom would not allow Jackson or Barnes to call 911 or leave the house until Odom "fled from the house" approximately thirty to forty minutes after the shooting.

¶8.     Odom was arrested and indicted for first-degree murder and armed robbery (for taking Jackson's phone).[3] Barnes and Jackson, among others, testified at trial during the State's case-in-chief. Odom rested without testifying or calling any witnesses. The jury found him

---

[3] Odom was also indicted for kidnapping. However, the trial court granted a directed verdict on that count at the close of the State's case-in-chief.

4

guilty of first-degree murder and armed robbery, and the court sentenced him as a violent habitual offender to two terms of life imprisonment without eligibility for parole. Odom filed a motion for judgment notwithstanding the verdict or a new trial, which was denied by operation of law. *See* MRCrP 25.3. Odom later filed an untimely notice of appeal. This Court suspended the rules and allowed the appeal to proceed. *See* M.R.A.P. 2(c).

## ANALYSIS

¶9. On appeal, Odom argues that "[t]he trial court failed to adequately instruct the jury on the essential elements of the crime [of first-degree murder] and the State's burden to disprove self-defense beyond a reasonable doubt." He also argues that the evidence was insufficient to convict him of armed robbery.

### I. Jury Instructions on Self-Defense

¶10. Odom argues that the trial court erred by giving the State's elements instruction for the crime of first-degree murder that failed to include "not in necessary self-defense" as an element of the offense, by refusing proposed elements instruction D-13 that included that same element, and by refusing proposed instruction D-9, which would have instructed the jury as follows:

> Ladies and Gentlemen of the jury, you have heard testimony today that DeVon Odom is asserting that he acted in self-defense on October 24, 2019. Self-defense is a legal defense.

> In order for DeVon Odom to have acted in self-defense, he must have believed that he was in actual danger or have reasonably believed that his assailant intended to cause great bodily harm to him, and that DeVon Odom reasonably believed that his assailant was about to carry out his actions against DeVon Odom. *DeVon Odom does not have to prove that he acted in self-defense. The State has the burden of proving beyond a reasonable doubt that*

5

*the he did not act in self defense. If you find that the State did not prove beyond a reasonable doubt that DeVon Odom did not act in self-defense, then you shall find DeVon Odom Not Guilty.*

(Emphasis added).[4] Odom argues that the trial court's rulings on these instructions constitute reversible error because the court failed to instruct the jury that the State had the burden to prove beyond a reasonable doubt that he did not act in self-defense.

¶11.   "The trial court enjoys considerable discretion regarding the form and substance of jury instructions." *Higgins v. State*, 725 So. 2d 220, 223 (¶15) (Miss. 1998).   Thus, the standard of review for the grant or denial of requests for jury instructions generally is abuse of discretion. *See Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010).   "When reviewing the giving or refusal of jury instructions, we do not view the jury instructions in isolation, but instead we consider them as a whole." *Taylor v. State*, 109 So. 3d 589, 595 (¶18) (Miss. Ct. App. 2013).   "In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Milano v. State*, 790 So. 2d 179, 184 (¶14) (Miss. 2001).   "If warranted by the evidence, it is fundamental that a defendant is entitled to a jury instruction on his theory of the defense." *Baker v. State*, 315 So. 3d 558, 563 (¶14) (Miss. Ct. App. 2021) (quoting *Johnson v. State*, 749 So. 2d 369, 372 (¶10) (Miss. Ct. App. 1999)).   However, "a defendant's 'right to jury instructions that present his theory . . . is not absolute.'" *Rasheed v. State*, 237 So. 3d 822, 828 (¶15) (Miss. Ct. App. 2017) (quoting *Davis v. State*, 18 So. 3d 842, 847 (¶15) (Miss. 2009)).   "A defendant is not entitled to an instruction that is 'without foundation in the evidence.'" *Id.*

---

[4] The trial court refused instructions D-13 and D-9 after finding the State's instructions on self-defense were sufficient.

6

¶12.   As an initial matter, Odom could not have been prejudiced by the refusal of additional self-defense instructions unless there was some basis in the evidence for a rational jury to find that he acted in self-defense.  For instance, in *Smith v. State*, 383 So. 3d 1246 (Miss. Ct. App. 2023), *cert. denied*, 383 So. 3d 612 (Miss. 2024), the defendant argued that the trial court erred by giving a "pre-arming" instruction that the Mississippi Supreme Court had condemned as an improper instruction regarding the defendant's right of self-defense.  *See id.* at 1251 (¶23).  However, this Court held that because "the only proof at trial was that [the defendant] was the initial aggressor in the conflict with [the victim]," "the giving of the now-abolished pre-arming instruction did not prejudice [the defendant's] right and ability to fully present his defenses."  *Id.* at 1252 (¶¶26-27).  As this Court put it, "[t]he instruction could not undermine [the defendant's] self-defense claim when there was no evidence upon which a rational jury could have found it applicable."  *Id.* at (¶27).

¶13.   In the present case, the same holds true.  The evidence showed that Odom angrily interrogated Barnes about the nature of her relationship with Cooper, walked into the front room where Cooper was asleep, and immediately shot Cooper three times, killing him. Cooper also had two lacerations (blunt force injuries) to his head, which likely explain the brief sounds of "furniture moving around" or "rumbling" that Barnes heard.  Cooper had a gun at the time of his death, but it was still in his waistband after Odom shot him.  In addition, Jackson testified that Cooper was still reclined on the couch, and Barnes testified that Cooper appeared to be ducking or crouching to avoid being shot.  Odom offered no testimony or other evidence to counter the State's uncontradicted evidence.  Put simply, there

7

is *no evidence* that Cooper attacked or threatened Odom in any way. Similar to *Smith*, the alleged error could not have prejudiced Odom's "self-defense claim when there was no evidence upon which a rational jury could have found it applicable." *Id.*

¶14. In any event, we also conclude that the jury instructions in this case, when read as a whole, were adequate. In relevant part, the trial court instructed the jury as follows:

> DeVon Odom has been charged in Count I of the Indictment with the offense of First-Degree Murder. If you find from the evidence in this case *beyond a reasonable doubt* that:
>
> 1.    On or about the 24th day of October, 2019; in the First Judicial District of Hinds County, Mississippi
>
> 2.    That Dontavius Cooper was a human being; and
>
> 3.    That DeVon Odom *without authority of law* did willfully and with malice aforethought kill Dontavius Cooper by shooting him with a firearm *with the deliberate design to effect the death of Dontavius Cooper*;
>
> then you shall find the defendant guilty of First-Degree Murder.
>
> If the State has failed to prove any one or more of the above listed elements *beyond a reasonable doubt*, then you shall proceed in your deliberations to consider the lesser offense of Second Degree Murder.
>
> . . . .
>
> *The Court instructs the jury that "deliberate design" as it is used in these instructions, means an intent to kill without authority of law, and not being legally justifiable, or legally excusable. . . .*
>
> . . . .
>
> *The Court instructs the jury that you are bound, in deliberating upon this case, to give the defendant the benefit of any reasonable doubt of DeVon Odom's guilt that arises out of the evidence or want of evidence in this case. There is always a reasonable doubt of DeVon Odom's guilt when the evidence simply makes it probable that he is guilty. Mere probability of guilt will never*

8

warrant you to convict DeVon Odom. It is only when, after examining the evidence on the whole, you are able to say on your oaths, *beyond a reasonable doubt*, that DeVon Odom is guilty that the law will permit you to find him guilty. You might be able to say that you believe DeVon Odom to be guilty, and yet, if you are not able to say on your oaths, *beyond a reasonable doubt*, that DeVon Odom is guilty, it is your sworn duty to find DeVon Odom "Not Guilty."

The Court instructs the jury that a reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of evidence, or the insufficiency of the evidence, but however it arises, if it arises, it is your sworn duty to find DeVon Odom "Not Guilty."

. . . .

The Court instructs the jury that to make a killing justifiable on the grounds of self-defense, the danger to the defendant must be either actual, present and urgent, or the defendant must have reasonable grounds to believe that the victim intended to kill the defendant or to do him some great bodily harm, and in addition to this, he must have reasonable grounds to believe that there is imminent danger of such act being accomplished. *It is for the jury to determine the reasonableness of the grounds upon which the defendant acts. If you, the jury, unanimously find that the defendant acted in self-defense, then it is your sworn duty to return a verdict in favor of the defendant.*

(Emphasis added).

¶15. Thus, the court instructed the jury that it was the *State's burden* to prove beyond a reasonable doubt that Odom killed Cooper "without authority of law" and with "deliberate design." The court instructed the jury to acquit Odom of first-degree murder if the State failed to meet its burden of proof on any element of the offense. Next, the court instructed the jury that the term "deliberate design," as used in the elements instruction, meant that the killing was "*not* . . . legally justifiable, or legally excusable." (Emphasis added). Finally, the court properly instructed the jury on the right of self-defense, that a killing in self-defense *was* "justifiable," and that if Odom "acted in self-defense," it was the jury's "sworn duty to

9

return a verdict in [Odom's] favor." Accordingly, reading the instructions together as a whole, the court instructed the jury that it was the *State's burden* to prove *beyond a reasonable doubt* that the killing was *not* "legally justifiable," that a killing in self-defense *is* legally justifiable, and that it was the jury's sworn duty to acquit Odom if he acted in self-defense.

¶16.    Again, "the instructions are to be read as a whole[,] and omissions from one, so long as not creating inconsistent instructions, can be corrected by language in others." *Johnson v. State*, 749 So. 2d 369, 374 (¶21) (Miss. Ct. App. 1999). The instructions given in this case may have been "imperfect, but on balance [they] provided the guidance necessary that if there was any reasonable doubt about a determination that the jury was to make, [Odom] was to be found not guilty." *Id.* at 375 (¶22) (holding that jury instructions regarding self-defense were adequate despite the omission of self-defense from the elements instructions and the lack of a specific instruction regarding the State's burden to disprove self-defense). Accordingly, we find no reversible error in the instructions.[5]

## II.    Sufficiency of the Evidence

¶17.    Next, Odom argues that the evidence was insufficient to support his armed robbery

_____

[5] In *Johnson*, we stated that "[w]hen self-defense becomes an issue, the State's instruction setting forth the elements of the crime should specifically place the burden of proof upon the State," and the jury should be clearly instructed regarding "the State's burden in disproving self-defense beyond a reasonable doubt." *Id.* at 374 (¶20). That continues to be true and by far the best practice. However, we find no reversible error in this case because, for the reasons explained above, the evidence at trial did not support any claim of self-defense. In addition, as in *Johnson*, the instructions given—read together as a whole—were adequate to instruct the jury on the law and the State's burden to disprove self-defense beyond a reasonable doubt.

conviction. Specifically, Odom argues the State failed to prove beyond a reasonable doubt that he intended to permanently deprive Jackson of the phone.

¶18. We review challenges to the sufficiency of the evidence de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). "We view the evidence in the light most favorable to the prosecution to determine whether rational, reasonable fair-minded jurors could have found that the State proved each essential element of the crime." *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010) (quotation marks and emphasis omitted). "[A]ll credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole*, 46 So. 3d at 293-94 (¶20). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all elements of the offense." *Williamson v. State*, 375 So. 3d 1158, 1167 (¶19) (Miss. Ct. App. 2023) (citing *Poole*, 46 So. 3d at 293-94 (¶20)).

¶19. "The elements of armed robbery are: (1) a felonious taking or attempt to take; (2) from the person or from the presence; (3) the personal property of another; (4) against his will; (5) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." *Cowart v. State*, 178 So. 3d 651, 666 (¶42) (Miss. 2015). "Robbery is a specific-intent crime; as such, the State is required to prove that the defendant took the personal property of another with the intent to permanently deprive that

11

person of his property." *Croft v. State*, 992 So. 2d 1151, 1158 (¶28) (Miss. 2008). "Under the law intent to steal is an indispensable element of robbery, and . . . where the property of another is taken *with an intent to return it to the owner*, the taking is not with intent to steal and is not larceny." *Watts v. State*, 317 So. 2d 715, 717 (Miss. 1975) (quotation marks omitted) (emphasis added). "The issue of whether there is intent [to permanently deprive the victim of his property] is for determination by a jury." *Id.*

¶20. Jackson testified that he started to call for an ambulance after Odom shot Cooper, but Odom stated, "No, you're not going to call anyone." At this point, Odom was still holding his gun and had Cooper's gun in his waistband. Odom then took Jackson's phone and Cooper's phone. In a written statement that he made on the day of the murder, Jackson similarly stated that Odom "shot [Cooper] and stole my phone. He held us hostage and would not allow us to render aid to [Cooper] for about thirty minutes."[6] Jackson also testified that after Odom took his phone, Odom paced back and forth with his gun while stating that he might kill Jackson and Barnes.

¶21. Odom does not dispute that there was sufficient evidence for the jury to find beyond a reasonable doubt that he took Jackson's phone against his will or that he put Jackson in fear of injury by exhibiting a deadly weapon. However, Odom does argue that the evidence was insufficient to show that he intended to permanently deprive Jackson of the phone. Odom relies on the testimony of Detective Jasmine Haynes, who stated that the police later found Jackson's phone somewhere at the crime scene.

---

[6] The statement was admitted at trial without objection.

¶22. We disagree. The evidence does permit an inference that Odom dropped or left the phone somewhere at the crime scene when he fled. However, this occurred thirty to forty minutes after Odom "stole [Jackson's] phone" at gunpoint. Odom did not return the phone to Jackson before he fled. Nor is there any evidence that Odom intended to return the phone to Jackson at the time he stole it. The fact that Odom apparently dropped or left the phone when he fled thirty to forty minutes after he stole the phone does not preclude a rational jury from finding that Odom intended to permanently deprive Jackson of the phone when he took it from him at gunpoint. Whether the defendant in a robbery case intended to permanently deprive the victim of his property "is for determination by a jury." *Watts*, 317 So. 2d at 717. And on appeal, the issue is not "whether *we* think the State proved the elements." *Poole*, 46 So. 3d at 293-94 (¶20) (emphasis added). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all elements of the offense." *Williamson*, 375 So. 3d at 1167 (¶19). In this case, there was sufficient evidence to support Odom's armed robbery conviction.

¶23. Accordingly, Odom's convictions and sentences are **AFFIRMED**.

**CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**