KING, Justice,
for the Court:
PART ONE
¶ 1. A jury convicted Kendrick Cowart of armed robbery and conspiracy, and acquitted him of murder and manslaughter. The trial court sentenced him, to fifty-three years: forty-eight years for. armed robbery and five years for conspiracy. Terrance London, Cowart’s co-defendant who pled guilty to armed robbery, conspiracy, and manslaughter,, received a sentence of either forty or forty-five years. Cowart appeals, arguing that-this, .Court should reverse his convictions because his .statement to police should have been suppressed, photographs of the victim should have been suppressed, the jury was improperly instructed, and the verdicts are against the weight and sufficiency of the evidence. He' also argues that his sentence was improper; ás he was punished for'exercising'his right to trial by jury, he was punished for acquitted conduct, the sentence constitutes an illegal sentence not reasonably less than his life, the trial court failed to Consider all-relevant factors, and the sentence is cruel and unusual. Co-wart’s arguments regarding his convictions are without merit; For the reasons discussed, Cowart’s convictions are affirmed.

FACTS AND PROCEDURAL HISTORY

¶ 2. Late Friday, July 10,2009, or early Saturday July 11, 2009, the Express Cash in Pike County, Mississippi, which was across the street-from Sanderson Farms, *655 was robbed. During the robbery, Peggy Sue Wilkinson, Carter was beaten. She was discovered at about 1:00 tun. on Saturday, July 11. After she was taken to the hospital by ambulance, the crime- scene was processed by Greg Nester of the Mississippi Bureau of Investigation (MBI). He collected multiple items for DNA and fingerprint testing, photographed the bloody scene, and preserved' steps with bloody footprints on them, among other things.
¶ 3. Carter succumbed to her injuries the next day, passing away on July 12, 2009. The cause of death, as determined by the forensic pathologist, was multiple blunt force injuries to the head. The forensic pathologist determined that the manner of death was homicide. No suspects immediately came to light, but after approximately eight months, investigators honed in on Terrance London, Tecory Wade, and Kendrick Cowart as suspects. London and Wade both eventually confessed to the crime, although London did not confess until after he learned that police had identified his DNA at the scene.of the crime. Both men implicated Cowart.
¶ 4. On March T9, 2011, the grand jury returned an indictment charging London and Cowart with depraved heart murder, armed robbery, and- conspiracy to commit armed robbery; It charged Wade with accessory after the fact to murder and armed robbery. The State offered plea deals to both London and Wade. Wade pled guilty to accessory after the fact. Wade’s plea deal gave him one year of jail time, one year of house arrest, and three years of probation. ..London pled guilty to manslaughter, armed robbery, and conspiracy to commit armed robbery, and he apparently received a sentence of forty or forty-five years:, twenty-five or. thirty years for armed robbery, five for conspiracy, and ten for manslaughter.[1] The State opted..to try Cowart on the,charges of murder, armed robbery, and .conspiracy to commit armed robbery.
¶ 5. Prior to trial, Cowart filed a motion to suppress his videotaped statement, as well as his other .statements, to the police, and a hearing was held on the motion.[2] *656 Cowart was interviewed by Detective Hay-good, an investigator with the Pike County Sheriffs, Department, three times, once before he was under arrest, then when he was under arrest on April 14, 2010, and again on April 20, 2010. The April 20, 2010, interview was videotaped. Detective Fairburn also interviewed Cowart, on April 16, 2010. The State introduced the waiver of rights forms signed by Cowart. The waiver of rights form from the.April 16, 2010, interview contains a notation that Cowart had finished McComb High School.
¶ 6. The videotaped statement reveals that, midway through the interview, Co-wart demanded to be taken back to his cell, clearly requested a lawyer, and handcuffed himself in preparation for being taken back to his cell. The trial court held, and the State conceded, that the portion of the videotaped statement after Cowart requested a lawyer was inadmissible; however, it held that the portion of Cowart’s statement that occurred prior to his request for counsel was admissible. As to the initial waiver of rights, the videotape reveals that Detective Haygood began to read Cowart his Miranda[3] rights, but that Cowart affirmatively stopped Detective Haygood from reading him his rights, indicating that he knew his rights and would sign the waiver. On the videotape, Cowart was coherent and appeared intelligent. Furthermore, at one point when Detective Haygood left the room, Cowart mumbled to himself that his mother told him not to talk to the police, indicating he knew and understood his rights. He then asserted his right to counsel midway through the interview.
¶ 7. Trial began on September 24, 2012, and continued through September 28, 2012. Prior to opening statements, the court addressed the issue of certain photographs of Carter. Cowart objected to three of the photographs, all of those photographs showing Carter in the hospital. Cowart argued that the State did not need three photdgraphs to show blunt force trauma to the head; it only needed one. Moreover, he objected to the photos having “all the tubes and hospital stuff on it and other things, which is prejudicial.” The State argued that “one photograph is the right side of her head, one is the left. One is just a distant view, which shows a little more clear of her face. And that this is the top, her.forehead. They’re all different injuries, Your Honor. Those are the only photographs that we intend to introduce with this witness which shows the fatal injuries.’’ The court found that under Rule 403, the photographs, even with the medical devices, were more probative than prejudicial in the case for depraved heart murder. However, the court limited the number of photographs of that nature to the three presented. The photographs were then admitted during the testimony of the responding police officer, Officer Moyo Brown.
¶ 8. At trial, several witnesses testified. Wade testified that London called him the day of the murder and asked Wade for a ride, and that he then picked up London and Cowart. He drove them to a restaurant called ‘ Granny’s, near Sanderson Farms. Later, London called and asked that Wade come back and pick London and Cowart up from the same place, and Wade complied. Wade testified that he dropped them off at London’s house, and then London called Wade again and asked him to get a hotel room, which he did. Wade drove London and Cowart to a hotel room at “the Camellia” and left them there. Later that night, Wade went to Cowart’s girlfriend’s house and. played video games with Cowart. The next morning, London *657 gave Wade $2,500 and said that he appreciated what Wade had done for him.
¶ 9. London also testified. London claimed that he and Cowart spent approximately four or five hours together on July 10, 2009, prior to the robbery. He asserted that, during that time, Cowart used London’s cellular phone to call Cowart’s girlfriend, Demetrius Thompson. He stated that Wade drove him and Cowart to Granny’s and that they walked through the woods to Express Cash. He testifiéd that when Carter went outside, Cowart went behind the door with a stick, while London played lookout and warned Cowart about Carter’s return. , When Carter re-entered the building, London testified that Cowart hit her in the face with the stick, and when she tried to run away, he pulled her inside and hit her multiple times. She fell to the ground; meanwhile, London was robbing the business. According to London, at one point, Carter attempted to get up again, and Cowart hit her a few more times, London then suggested they tie her up, and London attempted to tie her up with both white tape and orange wire. London further testified that Carter’s watch fell to the floor when he was trying to tape her wrists together. He testified that they put all the evidence in a bag, and Wade came and picked them up. He then testified that all three of then) went to the Camellia Hotel and split up the money. He claimed that he received a little more than $8,000, Wade received close to $3,000, and Cowart received the majority of the money. He claimed they then discarded the evidence in the woods. After they heard that Carter had died, they went to an old school and all three of them burned the evidence.
¶ 10. London admitted that he had previously been imprisoned on attempted burglary and conspiracy convictions, and that Wade was involved in the previous burglary attempt for which London was convicted. ■ London admitted that he pled guilty to manslaughter, armed' robbery, and conspiracy, and that he was sentenced to forty years. He also admitted that, before he confessed, he requested that the police charge him with manslaughter in exchange for his statement. Moreover, during cross-examination, Cowart asked London about his multiple inconsistent statements to police. He also cross-examined him regarding multiple inconsistencies between his testimony and that'of Wade.
¶ 11. Thompson, Cowart’s girlfriend and the mother of his child, testified. She noted that Cowart had worked at Sander-son Farms, and that he did not go to work on July 10, 2009. She testified that she went to work at 2:00 or 3:00 p.m. on Friday, July 10, 2009. She testified that, around noon that day, she saw Cowart with London on London’s porch. She also testified that she had a cell phone, and that Cowart did not, but that she took her phone with her to work on July 10, 2009. She stated that she woke up at around 2:00 a.m. on Saturday, July 11, 2009, and saw Cowart and Wade at her house. Thompson also testified regarding jailhouse letters she received from Cowart. The letters described money Cowart claimed to possess, and contained the following, statements: 1) “[M]e and my mama paid 4 my lawyer. I spent my 401K money (6,000) + my checks I had saved 4 my truek[;]” 2) “I have save [sic] 6,000 dollars for that truck saved and I had to spend it all on my lawyer. Bay I got a little bit more and then I’m broke. Bay my stocks "+ bonds are 4 you and Jr once they are sold[;]” 3) “When I come home we can blow that stocks + bonds money that I’m going to get. Bay it should be about 10 to 20,000.”
¶ 12. A witness for Cellular South testified to authenticate London’s cellular telephone records. The records indicated that London and Wade called one another, and *658 most likely spoke to one another given the duration of the phone calls, multiple times on July 10 and July 11, 2009. The records indicate both that London called Wade- and that Wade called London. The records also indicate-that.London’s phone called Thompson’s phone several times on July 10, and all the call durations were less than sixty seconds.[4] The records indicated both that London’s phone called Thompson’s phone and that Thompson’s phone called London’s phone on July. 11 and 12, 2009.
¶ 13. Greg Nester, the crime scene examiner from the MBI who processed the crime scene, testified in detail. He described the crime scene, including blood splatters, blood stains, and location of items and stains; he authenticated crime scene photographs; he described his collection of materials for testing and identification; and he described how and what testing' was performed on those materials. Bloody footprints were located on the top step of the stairs leading into Express Cash. The materials that Nester collected included the board of the top step with the bloody footwear impressions, a watch, the eashbox, some of the' victim’s clothing, masking tape allegedly used to bind the victim, a metal bar, and samples of blodd.’ He also testified that law enforcement found finger' impressions in blood that did not appear to have fingerprint identification ridge detail,'but rather had a' “material-type look,” which indicated that gloved fingers may have made the' impression.'
¶14. Detective Haygood testified regarding his investigation in the ease. He testified that law enforcement officers were not able to determine an exact amount of money that was stolen. However, they were able to determine, that the maximum amount possibly stolen would have been approximately $16,000. He further testified that “just inside the edge of the wood line behind” Express Cash, investigators found “a pair of white knit cotton gloves that appealed] to be similar to the gloves” used at Sanderson Farms by its employees.[5] Several months after the incident, the sheriff’s department received a tip, and based on that tip, the sheriffs office spoke with Cowart, Wade, London, and two other men in March 2010, At that point, the sheriff s' office collected DNA oral swabs from all five individuals because the watch found at the scene of the crime contained DNA to which they wanted to compare the five individuals’ DNA. The DNA on the watch was a partial profile match to London, but did not match Wade or Cowart. After receiving the results, London confessed to involvement in the crimé and implicated Wade and Cowart. Detective Haygood then spoke with Wade, and testified that Wade’s version of the events was generally consistent with London’s version. Also based on the tip received, the sheriffs department went to the “old Taggert School,” an abandoned school building in Summit, Mississippi,[6] and found 'several' burned or partially burned items, including Express Cash receipts, items that appeared to be part of a purse and personal items from - a purse,[7] another pair of white cotton gloves, a dark-colored shirt, and a small cooler. They *659 also found torn up and burned deposit and withdrawal receipts that were hidden in a cinderblock.
¶ 15. Detective Haygood téstiñed that, in furtherance of the investigation, he interviewed Cowart approximately - three times and Detective Fairburn' interviewed him once. The' first interview lasted approximately thirty to forty-five minutes, and Cowart was' not under' arrest' at that time. The second interview was oh' April 14, 2010, and was not recorded. At that interview; Cowart signed a Miranda rights form and a waiver of rights form, which Detective Haygood testified he explained to Cowart. During that interview, Cowart told Haygood that he had taken off July 10, 2009, from work at Sanderson Farms. Detective Fairburn interviewed Cowart again on April 16, 2010. He'testified that Cowart told him that he was with Wade visiting friends from 6:30 or 7:00 p.m. on July 10, 2009, until about 9:30 p.m., when they went to Thompson’s home until approximately 11:00 p.m. that night. At 11:00 p.m., Thompson arrived home and Thompson and Cowart went to bed. On April 20, 2010, Detective Haygood interviewed Cowart again, and in that interview, Cowart stated that he had seen London on July 11, 2009. Detective Haygood testified that in a prior interview, Cowart had stated that'he had not seen London. Detective Haygood testified that Cowart signed another waiver of rights form before the April 20, 2010, interview. He testified that Cowart indicated that Detective Haygood did not-need to go over the rights form, because he knew what1 it was and understood it. • - •
¶16. The State then introduced the video of the April 20, 2010, Cowart interview. Cowart’s counsel indicated that he had no objection, then asked to have a bench conference. He asked where the video would stop, and the State indicated that the DVD would stop after Cowart mentioned an attorney and put his own handcuffs back on. The court then found that “with the objections previously noted at the [suppression] hearing, the DVD, as edited, will be admitted into evidence.” The video shows Cowart explaining the events of July 10 and 11 and explaining when he saw London and Wade, as well as explaining the phone records and stating that hé did not spéák to London on July 10. '
¶ 17. Detective Haygood also described collecting shoes from Cowart and London in April 2010. He collected two pairs of Nike Air Force One tennis shoes (a .very common shoe) belonging to Cowart, and a pair of Polo shoes belonging to London. One of the pairs of Cowart’s shoes was excluded as being the source of either of the two bloody footprints, but the other pair was not. As to the pair of Cowart’s shoes that was not excluded, the FBI shoe-print analyst testified that Cowart’s shoe corresponded “in design and approximate physical Size” to one of the bloody shoe-prints, but that “the ‘ shoes are clearly more worn than the crime scene impression;” thus he could not determine “whether or not that shoe left the impression.” However, the Polo shoes belonging to London were matched to one of the bloody shoeprints, with the FBI finding that London’s shoes “could have” made the impression.
¶ 18. Detective Haygood also testified that in June 2011, he spoke with Perry Lang, a man incarcerated in the Pike County jail. Lang and Cowart, were in the same zone of the jaü for less than two months in 2011. After Detective Haygood’s interview with Lang, law enforcement officials began investigating a missing ring. Detective Fairburn, who accompanied Carter to the hospital, testified that he noticed severe damage to *660 Carter's right ring finger, but he did not recover any ring or see a ring on her.
¶ 19. Detective Haygood further testified that they sent Carter’s pants to be tested for DNA. He testified that the results came back positive for male DNA that did not match Cowart’s DNA, nor did it match the DNA of any of the other suspects in the case.
¶20. Detective Haygood also testified that he learned through his investigation that Wade and London had committed crimes, specifically burglaries, together in the past. He admitted that London’s statements to police included London asking Detective Haygood how Haygood was going to help London if he confessed, and London requesting that Detective ‘ Hay-good charge him with manslaughter instead of capital murder.
¶21. The store manager of Speedy Cash,[8] a payday loan company used by Cowart, testified that Cowart took out a loan on June 12, 2009, and apparently repaid it and took out another loan on June 27, 2009. He repaid that loan on July 11, 2009. Cowart did not take out another loan until September 14, 2009. She testified that Cowart would typically repay a loan and take out another one on the same day. She further testified that, in 2009, the only break in his taking out regular loans was from June 27, 2009 to September 14, 2009. However, on cross-examination based on the records introduced into evidence, she admitted that her characterization was incorrect and that there had been another break that year in Cowart taking out loans, frota the end of January 2009 until the end of March 2009.
¶ 22. Perry Lang testified that he was housed in the same zone at the Pike County Jail as Cowart, and that they became friends during the approximately seven months that they were housed in the same zone! Lang testified that Cowart told him that “they” went to steal money and that “we” (referring to Cowart and London) hit Carter because she was yelling. He also testified that Cowart told him that they took money and a ring, and that they hit Carter’s hand until the ring came off. He further testified that Cowart informed him that they burned the evidence of the crime at a school. On cross-examination, Lang admitted that in his original statement, he wrote that he was Cowart’s cellmate, but that Lang was never Cowart’s cellmate. Lang also testified that, he did not know any personal details regarding his “friend” Cowart, including whether he was married, whether he had. children, and whether he had a job. Further, on cross-examination, Lang admitted to at least three convictions for sale of cocaine. He was also charged with selling cocaine for a fourth time in 2010, and the sentencing in that case was scheduled for the month after Cowart’s trial. The State recommended a twelve year sentence, with six years suspended, to run concurrently with the sentence Lang was at that time serving.
¶ 23. Theresa Brumfield, a close friend of Carter’s, testified that Carter habitually and routinely wore a gold ring with a green stone on it. -Carter wore the ring on her right hand, and Brumfield testified that, to her knowledge, the ring had not been located since the crime. She also testified that she had been present during searches for the ring. Melissa Carter, Carter’s daughter, also testified regarding the ring. She testified that Carter wore the ring on her right ring finger every day. The State introduced photographs of Car *661 ter wearing a gold ring with a green stone on her right ring finger. It also introduced a photograph of Carter’s - injured right ring finger after the robbery.
¶ 24. Bo Scales performed DNA testing in the case, and he testified that his laboratory tested a pair of Carter’s pants and her watch. He testified that his lab found male DNA on both Carter’s watch and her pants. Cowart’s DNA was excluded from the DNA found on the watch, but it appears that his DNA was never compared to the DNA found on the pants. This is distinguishable from Detective Haygood’s testimony that the DNA from the pants was not a match to Cowart’s.
¶ 25. During jury instructions, Cowart objected “to the instruction.of the form of the verdict, including manslaughter.” The form of the .verdict was instruction S-12. He then specifically mentioned jury instruction S-10, outlining the charges, as providing the definition of manslaughter, but it is unclear from the transcript whether he was objecting to the instruction S-10 (including a manslaughter charge), instruction S-12 (the form of the verdict allowing a manslaughter conviction), or both. Regardless, the trial court overruled the objection" and allowed a manslaughter instruction. S-10 provided under Count One an instruction on murder, and then stated that:
Or, if you believe from the evidence in this case, beyond a reasonable doubt, that on or about July 11, 2009, in Pike County, Mississippi, the defendant, KENDRICK COWART, did wilfully, unlawfully and feloniously kill and slay one Peggy Sue Wilkinson Carter, a human being, in the heat of passion without malice and without premeditation, then you should find the said KENDRICK COWART guilty of manslaughtér in Count One.
The form of the verdict, S-12, had an option to find Cowart guilty of manslaughter on Count One. During jury deliberations, the jury sent the court a nóte asking “What is the legal definition of manslaughter and the length of time served?” The court agreed that the jury was not properly instructed on manslaughter, because the crime was not defined. The court then answered the jury with: “You have heard all testimony, received all evidence, and been instructed as to the law. Please continue deliberating.”
¶ 26. The jury ultimately found Cowart not guilty of Count One, for murder or manslaughter. It- found him guilty of armed robbery, but specifically declined to set his sentence at life. It also found him guilty of conspiracy to commit armed robbery.
¶ 27. A sentencing hearing was held on October 5, 2012. Cowart declined to make a statement. His attorney explained that he had advised Cowart not to make a statement because of the legal situation and any appeals, and emphasized that Co-wart understood the' Seriousness of the situation and that he wasn’t declining to make a statement out of any disrespect for the system. At sentencing, a pastor and Cowart’s mother testified on his behalf. His attorney pointed' out that Cowart had never been in serious trouble with the law, that he had held a job for eight or nine years (from the time he graduated high school until being arrested for this crime), and that he was a good employee. The State argued that “[disregarding whether the jury found him guilty of murder or not, they did find him guilty of the armed robbery at which this occurred. The death occurred during the course of the armed robbery. And based upon that, the State thinks the defendant merits the most severe punishment the. Court can -hand down.” The State also put forth evidence *662 of Cowart’s life expectancy, using actuarial tables published by the U.S. Census Department and the Social Security Administration. The State then had Carter’s son testify. Despite the fact that Cowart was acquitted of any criminal accountability for Carter’s death, her son spoke solely about the effect of the loss of his mother’s life and asked for justice. He noted that “the world lost a special-person” and emphasized that his one-year-old child will no longer get to see her grandmother and that his infant son will never know his grandmother. He concluded with:
The crime that was committed on July 10, 2009, was committed with no regard for.my Mom’s life. She was left to die in there while people went, and played video games. And no one called for her help. And all three of these guys knew of their injuries — of her injuries. And my mom, Sue Carter, deserves justice.
We saw by the evidence presented by the State that she fought for her life. But she no longer can fight for herself any more, so we must fight for her. She paid the ultimate price for the.- crimes of Kendrick Cowart, Terrance London, and Tecory Wade. And these three individr uals should receive the, maximum punishment allowed by law..
Most people get to say goodbye to their loved ones, one last time, as.these three individuals will probably be able to do. But because of these, three actions of these three individuals, we were not given that opportunity to say goodbye. However, we know, that we will see her again in heaven one day.
¶ 28: In making its sentencing decision, the trial court, indicated' that it had read the=presentence investigation report, a report that neither party placed in the appellate record. The court noted-that Cowart had only two misdemeanors prior to this crime, one for loud* music and one for driving with-a suspended license. It noted that “[h]e’s led a fairly productive life.” It then noted that “Mr. Cowart went from zero to a hundred when he got involved in this and he took part in this act.” The trial judge stated that “I can’t say anything to make Ms. Carter’s family' and friends feel better,” The court then found that the life expectancy of a twenty-six-year-old male was 50.86 years, and sentenced Cowart to forty-eight years to serve for the' crime of armed robbery. For the crime of conspiracy, the court sentenced Cowart to five years, to run consecutively' to the armed robbery sentence, for a total of fifty-three'years.
¶29. Cowart filed a motion for new trial, which the trial court denied. He argued that the sentence was excessive as compared to the sentences of Cowart’s co-defendants, ánd thus that the sentence reflected a punishment for Cowart’s choice to go to trial. The trial court cut off his argument and the following colloquy occurred:
BY THE COURT: Let me stop and ask you a question.
BY-MR. SWEET: Okay.
BY THE, COÚRT: Is it your position that people should not receive any consideration from the Court for acceptance of responsibility, or is that something the Court can take into consideration?
BY MR. SWEET: Acceptance of re- . sponsibility can be taken into,consid-eration_ However, I think in this case, looking at the fact that Mr. Co-wart did not' have a criminal history and his co-defendant did, I think that the Court should consider Mr. Cowart . haying a lesser sentence due to those reasons from that case....
BY THE COURT: Alright, thank you.
*663 The State interprets this colloquy during the motion for new trial as the “trial judge explained that he considered the fact that Cowart’s co-defendants took responsibility for their actions when determining the respective sentences.” However, the trial court never explained such a thing — it never indicated that it gave London, a convicted felon with more crimes in the current case than Cowart, a lesser sentence than. Cowart simply, because London, accepted responsibility for his crimes — but merely asked defense counsel .if it was defense counsel’s position that the court should give consideration to a person’s acceptance of responsibility. The trial court never explained how the differing nature pf London’s and Cowart’s prior criminal histories factored into his decision, despite Cowart’s, argument to that effect, .which, the State concedes. Cowart also argued that the sentence exceeded his life expectancy, that the trial court .erred in failing to define manslaughter, that the trial court erred in allowing into evidence certain photographs of the victim, and that Batson[9] issues warranted reversal. The trial court denied the motion for new trial .from the bench.
¶ 80. Aggrieved, Cowart appeals to this Court, arguing: 1) that the trial court abused its discretion in sentencing Cowart by improperly enhancing his sentence, punishing him for. exercising his right to trial by jury and failing to examine the Davis[10] factors; 2) that- re-sentencing is warranted because the trial court failed to justify the disparity between Cowart’s sentence and those of his codefendants; -3) that the trial court erred in failing to consider Cowart’s , race and gender when de-. termining his life expectancy during sentencing; 4) that Cowart’s sentence was cruel and unusual; 5) that the admission of certain photographs was unfairly prejudir cial; 6) that the jury was improperly instructed as to manslaughter; 7) that the trial court erred in admitting Cowart’s statement to the police; and 8) that the evidence was- insufficient to support the armed robbery .conviction. This opinion will reorganize the arguments in addressing them, to present a clearer analysis.

ANALYSIS

Convictions

q. Photographs
¶ 81. This Court reviews the trial court’s admission or' exclusion of evidence fór an abuse of discretion. Davis v. State, 849 So.2d 1262, 1255 (Miss.2003). “Photographs of a victim have evidentiary value where they T) aid in describing the circumstances of the killing and the corpus delicti; 2) where they describe the location of the body and cause of death; and 3) where they supplement or clarify witness testimony.’ ” Id. (citing Westbrook v. State, 658 So.2d 847, 849 (Miss.1995)). “Photographs of the victim[, however,] should not ordinarily be' admitted into evidence where the killing is not contradicted or denied and the corpus delicti and the identity of the deceased- have been established.” Conners v. State, 92 So.3d 676, 687 (Miss.2012) (quoting Jordan v. State, 995 So.2d 94, 110 (Miss.2008)). Reversal based on the admission, of - cumulative and/or gruesome photographs is rare. Id. (citing Barfield v. State, 22 So.3d 1175, 1181 (Miss.2609)). However, the trial court’s discretion ip admitting photographs is not unlimited,- but is “defined-by weighing a photograph’s probative evidentiary value against its prejudicial potential to arouse the passions of the jury” in accordance with Mississippi Rule of Evidence *664 403. Bonds v. State, 138 So.3d 914, 919 (Miss.2014). This Court gives “great deference to trial judges in the sound exercise of their discretion on the admission of photographs,” but it may reverse where “such discretion has-been abused by the admission of a photograph whose prejudicial effect far outweighs its probative value.” Id. at 919-20.
¶32. Cowart argues that four of the photographs admitted into evidence “were exceptionally gruesome and surely inflamed the passions of lay jurors- wholly unaccustomed to seeing any pictures of dead bodies, much less these horrific depictions.” He argues that the prejudicial impact of the photographs is not outweighed by them “marginal” probative value, and that they prejudiced the jury against Cowart. The primary objection is to three photographs that depict Carter connected to life support equipment, as well as one of her unconscious head with, “several gashes, cuts, and dried blood.” Cowart’s counsel objected to their introduction at trial, and the trial court overruled most,- but not all, of Cowart’s objections to photographs. The State argues that Cowart was clearly not prejudiced by the photographs of the victim because he was acquitted of murder and manslaughter. It also argues that the photographs were more probative than prejudicial.
¶-33. Cowart was being tried for depraved heart murder. The State was putting forth proof of the circumstances and cause of the victim’s death, and it also used the photographs to supplement and clarify witness testimony. The trial court carefully considered photographs proffered, and, for the most part, only allowed one photograph per injury to the deceased. To be sure, the photographs of Carter connected to life support are unpleasant, bloody, and sad, and were likely prejudicial to Cowart; But the question on appeal is whether the trial court abused its discretion because the prejudicial effect far outweighs the probative value. The State was attempting to prove depraved heart murder. While the fact of the murder was not disputed, the identity of the killer was. The photographs" corroborated London’s testimony that the victim was beaten and Lang’s testimony that her ring was stolen from off of her Anger. They clarify and support the testimony of the forensic pathologist as' to the manner of death. They also clarify and support the crime scene investigator’s testimony and the testimony of the scientist who tested the DNA regarding the evidence found at the crime scene, including the State’s explanations as to why the DNA test results may have been lacking. Moreover, the photographs do not possess the gruesome-nature that this Court has found overly prejudicial in the past; See Bonds, 138 So.3d 914 (photograph of decaying, maggot-infested face that was unnecessary to prove the manner of death was unduly prejudicial); McNeal v. State, 551 So.2d 151 (Miss.1989) (photographs of decomposed, maggot-infested skull that were unnecessary to prove the manner of death-were unduly prejudicial). Rather, they are -more congruent with cases upholding the admission of gruesome photographs. See Stringer v. State, 131 So.3d 1182 (Miss.2014) (thirty-three photographs of the crime scene and victim, including several of the victim with the top half of his head missing, were not unduly prejudicial because they did not rise to the level of inflammatory gruesomeness of McNeal, they aided the jury in determining the circumstances of the killing, and they clarified witness statements); Davis v. State, 849 So.2d 1252 (Miss.2003) (where victim was shot in the face and had massive injuries, four photographs depicting the victim’s body at the crime scene and two autopsy photographs depicting the injuries were not unduly prejudicial because *665 they depicted the angles and trajectories of the gunshots about which the forensic pathologist testified and they did not inflame the jury). ⅛
¶ 34. Thus, the four photographs of Carter depicting the injuries that caused her death, while likely prejudicial, especially in light of the fact that she is connected to life support machines in three of them, are not so gruesome and inflammatory that the trial court abused its discretion in determining that their probative value outweighed their prejudicial effect.

b. Manslaughter Jury Instruction

¶ 35. In general, this Court reviews rulings on post-trial., motions for abuse of discretion. Downs v. State, 962 So.2d 1255, 1258 (Miss.2007). In reviewing challenges to jury instructions,. this Court reads the instructions together as a whole, and does not single out any one instruction. Id.
¶ 36. Cowart argues that the trial court erred by improperly instructing the jury on manslaughter, Cowart was acquitted- of manslaughter and murder. Therefore, the issue of whether the jury was improperly instructed on manslaughter is- moot. Mayfield v. State, 612 So.2d 1120, 1128 (Miss.1992). Cowart attempts to redeem this argument by contending that, had the jury been properly instructed on manslaughter, it might have convicted him of manslaughter ahd acquitted him of armed robbery, which carries a lengthier sentence than manslaughter. This argument presumes that the jury wanted to convict him of something, and thus convicted him of arméd robbery, -without the elements of armed robbery having been proved, merely to ensure that Cowart was convicted of a crime. However, the- law presumes that the jury followed the court’s instructions. Johnson v. State, 475 So.2d 1136, 1142 (Miss.1986). “To presume otherwise would be to render the jury system inoperable.” Id'. Cowart offers no evidence that the jury did anything but follow the court’s instructions. Thus, this issue is without merit.
c. Statement to Police
¶37. The determination of whether a confession was voluntary is highly factual, and a trial court’s decision that a confession is admissible should be overruled on appeal only if the trial court committed manifest error, the decision was contrary to the overwhelming weight of the evidence, or the court applied the incorrect legal standard. McCarty v. State, 554 So.2d 909, 912 (Miss.1989). ‘In this case, the trial court suppressed the second half óf Cowart’s statement, made after he asserted his right to' an attorney. It admitted the first half of his statement.
¶38. Cowart claims that his statement “was. not knowing and intelligent because it was made without the full awareness of the nature of the rights being abandoned and the consequences of the decision to abandon it. Cowart was not subjectively aware of the .consequences from abandoning his Miranda rights.” The State argues that this-issue is proce--durally barred because Cowart failed to object to the admission of the statement. The trial court specifically noted that the video was admitted subject to the objections made at the suppression hearing, making clear that the video ,was admitted subject to Cowart’s objections. Thus, this issue is not procedurally barred for lack of objection.
¶ 39.- However, the Court need not consider this issue because Cowart does not explain in his appellate briefs why his statement was not voluntary, knowing, and intelligent. Rule 28 of the Mississippi Rules of Appellate Procedure requires that *666 the brief of the appellant contain “the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.” M.R.A.P. 28(a)(6) (emphases added). Cowart points this Court to absolutely nothing in the record to support his argument that the waiver of his rights and his statement to police were not knowing, intelligent, and voluntary. To that effect, this argument is procedurally barred.[11]

d. Insuffident Evidence

¶ 40. Cowart argues that his conviction for armed robbery was against the weight and sufficiency of the evidence, conflating the two standards. The State argues that the verdict was supported by both the weight and sufficiency of the evidence, and addresses the standards separately.

i Sufficiency of the Evidence

¶ 41. “A motion for judgment notwithstanding the verdict implicates the sufficiency of the evidence.” Ginn v. State, 860 So.2d 675, 684 (Miss.2003). This Court considers each element of the offense and reviews all of the evidence in the light most favorable to the verdict. Id. at 685 (quoting Sheffield v. State, 749 So.2d 123, 125 (Miss.1999)). This Court must accept as true all credible evidence consistent with guilt. Ginn, 860 So.2d at 685 (quoting Sheffield, 749 So.2d at 125). This Court must give the State “the benefit of all favorable inferences that may reasonably be drawn from the evidence.” Ginn, 860 So.2d at 685 (quoting Sheffield, 749 So.2d at 125). Moreover,-matters regarding the weight and credibility given tho evidence are the province of the jury. Ginn, 860 So.2d at 685 (quoting Sheffield, 749 So.2d at 125). This Court may reverse only when, “with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.” Ginn, 860 So.2d at 685 (quoting Sheffield, 749 So.2d at 125). Thus, if any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand. Bush v. State, 895 So.2d 836, 843 (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
¶42. The elements of armed robbery are: (1) a felonious taking or attempt to take; (2) from the person or from the presence; (3) the personal property of another; (4) against his will; (5) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon. Miss. Code Ann. § 97-3-79 (Rev. 2014); Wales v. State, 73 So.3d 1113, 1122 (Miss.2011). The only element of conspiracy to commit armed robbery is two or more persons agreeing to commit armed, robbery. Miss. Code Ann. § 97-1-1 (1)(a) (Rev. 2014); Glenn v. State, 996 So.2d 148, 154 (Miss.Ct.App.2008).[12]
*667 ¶ 43. Cowart first argues that “the tes» timony of prior conviction [sic] felons, who had all hoped to benefit from their testimony to implicate Kendrick Cowart, should not be the sole basis to sustain a conviction.” Cowart then focuses his argument on the fact that his DNA was not found at the crime scene or on Carter, therefore, he contends, the State failed to prove the fifth element of armed robbery He also argues that the State failed to show that Cowart willfully, unlawfully and feloniously took . Express Check’s cash from Caite.

ii Codeftindant Testimony

¶44. Issues of witness , credibility are properly resolved by the jury, Furthermore, the jury in this case was properly instructed on accomplice and jail informant testimony. “[W]hen a conviction rests upon accomplice testimony, the uncorroborated testimony of an accomplice may be sufficient to convict the accused.” King v. State, 47 So.3d 658, 664 (Miss.2010). “But if the accomplice testimony is uncorroborated and is- unreasonable, self-contradictory, or substantially impeached, then accomplice testimony is insufficient, and the trial court must direct a verdict of not guilty.” Id. (emphasis added).
¶45. In the instant case, while certain areas of the accomplice and jail informant testimony were certainly suspect, the testimony was not uncorroborated, nor was it unreasonable, self-contradictory, or substantially impeached. London and Wade both testified as to the events leading up to the robbery, the robbery, and the events after the robbery. While several inconsistencies between their testimony existed, their basic testimony regarding Cowart’s involvement was substantially similar. Moreover, the testimony of Thompson, Cowart’s girlfriend, placed him with London and Wade that day. Additionally, the phone records corroborated placing Cowart with London and Wade that day. Lang’s testimony was corroborated by the discovery that Carter’s ring was missing, and that discovery was only made because, of Lang’s testimony. Lang also knew of the location; where the evidence was burned. The State also showed that Lang was housed in the same unit as Cowart, but never .with London, Thus, the testimony of Cowart’s codefen-dants and the jail informant were not so unreliable as to be insufficient to support the jury verdict.

Hi Elements of the Crime

¶46. London’s testimony was that Cowart beat Carter and that they took the money .from her. His testimony, while suspect, was not .legally insufficient. Moreover, .both of Cowart’s eodefendants and a jailhouse informant testified that he intended to. .take property from Carter and that he did so violently. Furthermore, Cowart’s shoe could not be excluded as having made one of the bloody shoe impressions at the scene of the crime, and the State also introduced evidence that Cowart had some cash and that his finances were' in a better state than usual shortly after the time of the robbery. Lang’s testimony regarding Carter’s ring also showed both that^ Cowart intended to take property from her and did so with violence, as the State showed that her finger was broken where the ring was taken.. When viewed with all reasonable inferences in favor of the. verdict, a rational trier of fact could find all the elements *668 of armed robbery beyond a reasonable doubt.
¶ 47. Additionally, the testimony of London and Wade and the phone records, when viewed in a light most favorable to the verdict, provide sufficient evidence to support a conviction for conspiracy to commit armed robbery, as they indicate an agreement between Co-wart and London to commit the crime. Therefore, this issue is without merit.

iv. Weight of the Evidence

¶ 48. A motion for new trial carries a lower standard of review than that'for a challenge to the sufficiency of the evidence. Ginn, 860 So.2d at 685. “A motion for a new trial simply challenges the weight of the evidence.” Id. This Court reviews the lower court’s denial of a motion for new trial only if the trial court abused its discretion. Id. Thus, this Court “will not order a new trial unléss convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice.” Id. (internal quotations omitted); Moreover, factual disputes are the province of the jury. Id.
¶ 49. As Cowart conflated the issues of weight and sufficiency of the evidence, his arguments are the same, with the argument seemingly hinging on the lack of Cowart’s DNA at the scene of the crime. The State points out that the absence of his DNA is only one factor that the jury considered. The testimony of London, Wade, Lang, and Thompson, as well as the phone records, the evidence regarding Carter’s ring, and the evidence regarding the shoe print all tend to support Cowart’s guilt. Therefore, the verdict is not so contrary to the overwhelming weight of the evidence that it would be an unconscionable injustice to allow it to stand. Accordingly, the trial court did not abuse its discretion by denying Cowart’s motion for new trial. His convictions are affirmed.
PIERCE, Justice,
for the Court:
PART II
¶50. Kendrick Cowart took part in a heinous crime and was sentenced to a total of fifty-three years for his involvement in an armed robbery and conspiracy. In the recent, cases of Hampton v. State, 148 So.3d 992 (Miss.2014), and Foster v. State, 148 So.3d 1012 (Miss.2014), in which the entire Court participated, this Court held that similar arguments of excessive sentences under Mississippi Code Section 97-3-79 (Rev. 2014) were without merit. The same is true for the forty-eight-year sentence Cowart received for armed robbery in the present case.
¶ 51. This Court consistently has held that “sentencing ■ is within the complete discretion of the trial court and not subject to appellate review if it is within the limits prescribed by statute.” Cox v. State, 793 So.2d 591, 599 (Miss.2001) (quoting Hoops v. State, 681, So.2d 521, 533 (Miss.1996)). See also Ellis v. State, 326 So.2d 466, 468 (Miss.1976); Ainsworth v. State, 304 So.2d 656 (Miss.1974); and Boone v. State, 291 So.2d 182 (Miss.1974). Furthermore, we have, held that a “sentence within the limits of the statute is not cruel or unusual.” Clanton v. State, 279 So.2d 599, 602 (Miss.1973); Green v. State, 270 So.2d 695 (Miss.1972).
¶ 52. “[A] sentence is not illegal unless it exceeds the maximum statutory penalty for the crime.” Grayer v. State, 120 So.3d 964, 969 (Miss.2013) (emphasis added). Petitioner’s sentence does not exceed the maximum statutory penalty. Section 97-3-79 of the Mississippi Code requires a court to sentence a defendant convicted of armed robbery to a term of *669 less than life but not less than three years, if the jury does not return a life- sentence. Miss.Code Ann. § 97-3-79 (Rev. 2014).
¶ 53. In Rogers v. State, 928 So.2d 831 (Miss.2006), this Court held:
As ¾ general rule, this Court cannot disturb a sentence on appeal if that sentence is within the boundaries allowed by the statute. Hoops v. State, 681 So.2d 521, 537 (Miss.1996). Here, the sentence imposed by the trial court was acceptable as it did not exceed the statutory limits provided in Miss.Code Ann. § 97-3-65(2). See Wilkerson v. State, 731 So.2d 1173, 1183 (Miss.1999); see also Freshwater v. State, 794 So.2d 274, 277 (Miss.Ct.App.2001); Shabazz v. State, 729 So.2d 813, 822 (Miss.Ct.App.1998). Therefore, Rogers’[s] argument that he was sentenced to-more time than was applicable at the time of his offense is without merit.
Rogers, 928 So.2d at 835. Here, Cowart was convicted of armed robbery and conspiracy and was sentenced to a term of fifty-three years by the, trial court — forty-eight years for armed robbery and five years for conspiracy. This sentence conforms to the statute, i.e., the .trial court did not sentence him to life and the term was more than three years. The trial court did not deviate from the statute when imposing the sentence upon this petitioner, who was convicted of armed' robbery. After receiving all evidence offered at the sentencing hearing, including the petitioner’s limited criminal history, the seriousness of the crimes committed, petitioner’s life expectancy, and the victim’s impact statement, the trial court found that forty-eight years was a proper and legal sentence.
¶54. Relying primarily on this Court’s decision in McGilvery v. State, 497 So.2d 67 (Miss.1986), Cowart argues that there is a great disparity between his sentence and .the sentence of his accomplice, Terrance London, and that the trial court was required to consider London’s sentence when sentencing Cowart. London pleaded guilty to manslaughter and armed robbery, and it is unclear from the record before us whether London was sentenced to forty or forty-five years.
¶ 55. We do not think McGilvery carries much, if any, weight. First, McGilvery is completely silent as to what evidence of the codefendant’s sentence was in the record before the Court on direct appeal. And we are not sure that the McGilvery Court did not overstep the bounds of its standard of review for a direct appeal. For all we know, the code-fendant in that, case, who pleaded guilty, may have been sentenced after McGilvery. Second, and more significantly, McGilvery speaks to only one side of the coin. Of course, as McGilvery reiterated, it is constitutionally impermissible to penalize a criminal defendant for exercising the right to a jury trial. On the other hand, however, it is also constitutionally proper to show mercy to one who accepts responsibility for his or crime. See Hersick v. State, 904 So.2d 116, 128 (Miss.2004) (“Whether the defendant takes responsibility for his or her actions 4s a fair consideration for the trial court in sentencing.”).
¶56. Corbitt v. New Jersey, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978), is analogous to the case here before us. In Corbitt, the Supreme Court rejected the claim that because a plea of nolo contende-re might produce a lesser sentence than going to trial (which could result in mandatory life imprisonment), the New Jersey statutes imposed an unconstitutional burden on the defendant’s right to trial by jury.[13] Id. at 214-15, 99 S.Ct. 492. Corbitt explained:
*670 While confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant’s assertion of his trial rights, the imposition of these difficult choices is an inevitable — and permissible — attribute of any legitimate system which tolerates and encourages the negotiation of pleas. It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor’s interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty.
Id. at 220-21, 99 S.Ct. 492. Corbitt added that the Court has “unequivocally reoog-nize[d]” in other cases “the constitutional propriety of extending leniency in exchange for plea of guilty and of not extending leniency to those who have, not demonstrated those attributes on which leniency is.based.”' Id. at 224, 99 S.Ct. 492.
¶ 57. Pulling from this perspective, the Ninth Circuit Court of Appeals, in U.S. v. Carter, 560 F.3d 1107 (9th Cir.2009), rejected the claim that the disparity between the sentence , the appellant received and those received by his coconspirators was unreasonable. Id. at 1121. The Carter Court reiterated:
It is settled that so long, as there is no indication. the defendant has been retaliated against for exercising a constitutional right, the government may encourage plea bargains by affording leniency to those who enter pleas. Failure to afford leniency to those who have not demonstrated those attributes on which leniency is based is unequivocally constitutionally proper.
Id. at 1121 (quoting United States v. Narramare, 36 F.3d 845, 847 (9th Cir.1994), which (cited Corbitt, 489 U.S. at 223-24, 99 S.Ct. 492)).
¶ 58. Here, Cowart makes no showing that he was. retaliated against for exercising his right to a jury trial. All he presents is a post hoe claim that, because London received a lesser sentence after pleading guilty to armed robbery, conspiracy, and manslaughter, Cowart was punished, for exercising his right to a jury trial. This is not enough. Cowart’s claim demonstrates only that London likely received some discretionary leniency from the trial court (which the trial court of course did not have to extend) for taking responsibility for his actions and cooperating with the State in the case, i.e., a plea bargain. As illustrated above, both this Court and the Supreme Court repeatedly have upheld this system as constitutionally valid and necessary.
¶ 59. Again, based on the record before us, the triaT court took all relevant factors into consideration when sentencing Cowart and noted that his accomplices had accepted responsibility for their actions, while Cowárt had not. There is no great disparity in the sentences such that this Court should find that the trial judge abused his discretion in sentencing Cowart to forty-eight years for armed robbery.
¶ 60. “Our law has long provided that the imposition of a sentence following a criminal conviction is a matter within the discretion of the Circuit Court, subject only to. statutory mid constitutional limitations.” Jackson v. State, 551 So.2d 132, 149 (Miss.1989) (emphasis added). The sentence received by Cowart is not constitutionally infirm, nor does it exceéd the trial court’s sentencing authority. Given that the sentence is permissible under the Mississippi Code and our state and federal Constitutions, there exists no basis to ac- *671 eept Cowart’s argument that his sentence is illegal. As the sentence imposed by the learned trial judge was and is a legal sentence, Cowart’s sentence for armed robbery and conspiracy is affirmed.
¶ 61. For these reasons, we find Co-wart’s claim that the trial court punished him for exercising his right to a jury trial is without merit.
¶ 02. COUNT II: CONVICTION OF ARMED ROBBERY AND SENTENCE OF FORTY-EIGHT (48) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF CONSPIRACY TO COMMIT ARMED ROBBERY AND SENTENCE OF FIVE (5) YEARS IN THE GUSTO-DY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY TO SENTENCE IN COUNT III. APPELLANT SHALL PAY A FINE OF $2,000 ON EACH COUNT FOR A TOTAL FINE OF $4,000; RESTITUTION IN THE AMOUNT OF $6,605.70 TO THE CRIME VICTIMS’ COMPENSATION FUND; AND $16, 910.66 TO MARK NEWMAN TO BE PAID JOINTLY AND SEVERALLY WITH, CO-DEFENDANTS, AND COURT COST IN THE AMOUNT OF $630.67.
PART I: DICKINSON, P.J., KITCHENS, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J. SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. LAMAR, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN < OPINION. WALLER, C.J., NOT PARTICIPATING.
PART II: LAMAR AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., KITCHENS AND CHANDLER, JJ. WALLER, C.J., NOT PARTICIPATING.

. .Cowart asks that this Court take judicial notice of this fact, as it is on the website of the Mississippi Department • of Corrections (MDOC). The State does not take issue with that, and admits that London’s sentence for manslaughter, armed robbery, and conspiracy was less than Cowart’s for armed robbery and conspiracy. London testified that his plea deal was for only forty years, and the State-actually cites this testimony in its arguments regarding the sentences. MDOC’s website states' that London is serving forty-five years' ten of which are for manslaughter and five of which are for conspiracy, http://www.mdoc. state.ms.us/InmateDetails,asp?PassedId= 116546 (last visited Januáry 7, 2015)] How- ' ever, it also indicates that the forty-five years includes serving time, on five different sentences, including a prior attempted burglary about which he testified, his testimony indicating that his probation was revoked for that crime after he was arrested for the attendant crime. In any event, it is clear that London received no more than forty-five years in his sentence for the attendant crime, and likely-received even less.

. Cowart designated neither the actual motion to suppress nor the transcript of the suppression hearing as items to be included in the appellate record before this Court. The videotaped statement, however, is in the record. The, State moved to supplement the record with the transcript, and the Court granted that motion. However, in a second order, this Court denied the motion because it found that the court reporter stated “that no court reporter was present at that conference and no transcript is available.” The State contends in its brief that this was error on the part of the Court and attaches the transcript as an exhibit to its brief. The transcript is not certified by the trial court's clerk as is ret ’ quired by Mississippi Rule of Appellate Procedure 10(e). Thus, this Court will not consider it.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. A call is deemed ‘'answered” on the' call record if it' is answered by a person or by .voicemail. Thus, an "answered” call does not necessarily indicate that the caller spoke to a live person at the receiving number.

. The gloves were sent to a lab for testing. No results were introduced at trial.

. - London, Wade, and Cowart lived near the "old Taggert school,” ■

. No purse édonging to Carter was found at the scene of the crime or in her vehicle, but some personal items of hers were found scattered on the floor, • ‘ .

. Not to be confused with Express Cash, the payday loan company that was the subject of the robbeiy in this case.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. Davis v. State, 17 So.3d 1149 (Miss.Ct.App.2009).

. Procedural bar notwithstanding, this issue appears likely to be without merit, A review of the videotaped statement indicates that Co-wart voluntarily waived his rights, indicating that he knew and understood them, and that he told Detective Haygood that he would sign the waiver, having twice had his rights explained to 'him and twice sighed waivers thereof, jüst a few days’ prior,' On the video, Cowart appears coherent and intelligent. He has a high school education and had held a job with the same employer for several years, No coercion is apparent1 and no promises or threats were made by police. While Detective Haygood could and should have insisted on reading the rights in full, nothing in the record indicates that Cowart’s waiver was anything but knowing, intelligent, and voluntary.

, While Cowart challenges his conviction for conspiracy to commit armed robbery only in *667 passing, and the State does not mention the conspiracy conviction at all in its argument, this opinion will briefly discuss it.

. Article I, Paragraph 9 of the 1947 New Jersey Constitution guarantees that "[t]he *670 right of trial by jury shall remain inviolate.”