CARLTON, J., CONCURRING IN PART AND DISSENTING IN PART:
 

 ¶ 45. In this case, I would affirm the judgment and conviction of the circuit court, including Garner's conviction for conspiracy to commit wire fraud. I find that the majority misapplied the law as to the conspiracy to commit wire fraud charge as set forth in Count III of Garner's indictment. I therefore concur in part and dissent in part with the majority's opinion. The majority states that the record contains no evidence, direct or circumstantial, that Stewart earnestly believed that Garner was a nurse. Upon its determination that no evidence exists to show a union of Stewart's and Garner's minds regarding the fact that Garner was not a nurse, the majority finds that the circuit court erred by denying Garner's motion for a judgment notwithstanding the verdict (JNOV) challenging her conviction for conspiracy to commit wire fraud. The majority then reverses Garner's conviction for conspiracy to commit wire fraud (Count III) and renders a judgment of acquittal as to that charge.
 

 ¶ 46. When reviewing the sufficiency of the evidence, we "must give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence."
 
 Cowart v. State
 
 ,
 
 178 So.3d 651
 
 , 666 (¶ 41) (Miss. 2015) (internal quotation marks omitted). The supreme court has explained that "if
 
 any
 
 rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand."
 

 Id.
 

 ¶ 47. Count III of Garner's indictment charged as follows:
 

 [B]ased on a series of acts connected together and constituting parts of a common scheme or plan, on or about March 16, 2012, in Hinds County, Mississippi, [Garner] did conspire with another person to commit a crime, to-wit: on or about March 16, 2012, [Garner] and [Stewart] did willfully, unlawfully, and feloniously, corruptly agree, conspire and confederate, each with the other, to commit wire fraud, in violation of [s]ection 97-19-83 ... by making or causing to be made a false representation to [Gordon] that [Garner] was a licensed medical professional when in fact she was not, and by causing the transfer of two hundred dollars ($200.00) from [Gordon] to [Stewart] by the use of a Green Dot card, and for the purpose of executing such scheme or artifice or attempting so to do, transmitted or caused to be transmitted by mail, telephone, wire, electromagnetic waves, microwaves, or other means of communication or by person, any writings, signs, signals, pictures, sounds, data, or other matter across county or state jurisdictional lines, in direct violation of [s]ection 97-1-1(a)[.]
 

 ¶ 48. Jurisprudence reflects that "the elements of a conspiracy 'require recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose.' "
 
 Berry v. State
 
 ,
 
 996 So.2d 782
 
 , 786-87 (¶ 12) (Miss. 2008) (quoting
 
 Sanderson v. State
 
 ,
 
 883 So.2d 558
 
 , 560 (¶ 8) (Miss. 2004) ). To prove conspiracy, the State must "show that two or more persons agreed to commit a crime or agreed to accomplish an unlawful purpose."
 
 Id.
 
 at 787 (¶ 12) (quoting
 
 Morgan v. State
 
 ,
 
 741 So.2d 246
 
 , 255 (¶ 26) (Miss. 1999) ). However, the State is "not required to show that the parties entered an express or formal agreement. A conspiracy can be proven by the acts and conduct of the alleged conspirators and can be inferred from the circumstances."
 

 Id.
 

 at (¶ 13). This Court has also held that "conspiracy can be proven entirely by circumstantial evidence."
 
 Thomas v. State
 
 ,
 
 180 So.3d 756
 
 , 762 (¶ 19) (Miss. Ct. App. 2015) (internal quotation marks omitted).
 

 ¶ 49. Turning to review the evidence presented at trial, the transcript reflects that Barber testified that Gordon and Stewart communicated via email over several years regarding Gordon's desire to receive butt enhancements. The State submitted evidence showing that in one email Gordon sent to Stewart, dated November 14, 2011, Gordon told Stewart that she "is still looking for a good butt job like yours. If you are interested in helping me with a referral please give me a call." Gordon also told Stewart that she would compensate her "for this secretive information." Barber testified that Stewart refused to give Gordon the information over the phone, so Barber and Gordon flew to New York in February 2012 to meet Stewart. Barber stated that while in New York, Stewart told Barber and Gordon that "a lady named Tracey" performed her butt injections, and had been doing so for years.
 
 [4]
 

 Barber testified that Stewart expressly represented to her and Gordon that Garner was a nurse. Barber testified that during the New York trip, she and Gordon became aware that Stewart wanted $200 for a referral fee for providing Garner's information to them: "We knew about the Green Dot referral fee ever since New York."
 

 ¶ 50. Barber stated that on March 16, 2012, she and Gordon traveled from Atlanta, Georgia, to Jackson, Mississippi, so that Gordon could receive butt injections from Garner. According to Barber, as soon as she and Gordon arrived in Jackson, they stopped at a Walgreens so that Gordon could obtain a Green Dot MoneyPak card to wire $200 to Stewart. Barber testified that Stewart had originally planned to meet them at Garner's house, but the morning of the trip, Stewart informed Gordon that she was not going to be in Jackson that day. Barber stated that "before [they] left Atlanta[,] Gordon was on the phone with [Stewart] and [Stewart] was on speakerphone saying that she was going to be here so that's why [Gordon] had to get the Green Dot."
 

 ¶ 51. Barber also testified that on the morning of the trip, Garner and Gordon had been in communication, and Garner gave Gordon an address, which Gordon wrote down.
 
 [5]
 
 Barber testified that she originally thought Gordon wrote down Garner's address, but it was actually the address to the Walgreens. Barber explained that "[she] found out throughout this investigation that that address that [Gordon] wrote was never to [Garner's] house[,] it was to the Walgreens so [Gordon] could wire the money over to [Stewart] before she [could] even find out where [Garner's] house [was] at." On redirect examination, Barber also clarified that Garner, not Stewart, sent Gordon the directions to Walgreens:
 

 Q. Real quick, Ms. Barber, just so we're clear[,] the directions that you received that morning[,] who were they from?
 

 A. [Garner].
 

 Q. Okay. Now, these directions were not to [Garner's] house, were they?
 

 A. No, it was to the Walgreens.
 

 Q. And before you got to [Garner's] house you had to wire the money to [Stewart]; right?
 

 A. Yes, she did.
 

 ¶ 52. Barber testified that after arriving at Walgreens, Gordon paid the $200 toward the Green Dot MoneyPak from Walgreens, but that she (Barber) texted the numbers to Stewart to complete the wire process. Barber stated that she and Gordon later received confirmation from Stewart telling them that she had received the $200. Barber and Gordon then called Garner, who gave them directions to her house.
 

 ¶ 53. Barber testified that when she and Gordon arrived at Garner's house, Garner "was standing in scrubs and she did say she was a nurse and we went from there." Barber stayed in a "little waiting area" in Garner's house while Garner and Gordon went into another room. Barber testified that immediately after Garner injected Gordon, Gordon informed Barber that she
 was in pain. Barber testified that Gordon started coughing before they even left Garner's house. According to Barber, Garner suggested that Gordon take Benadryl and cough syrup.
 

 ¶ 54. While traveling back to Atlanta, Barber testified that Gordon was vomiting and having trouble breathing. Barber stated that she had to stop multiple times to let Gordon defecate on the side of the road. Barber testified that she and Gordon called Stewart and relayed Gordon's symptoms to her. Stewart assured them that she had similar symptoms after receiving injections, and she suggested that they stop and get a breathing treatment. Stewart told them not to stop at any hospitals on the way back to Atlanta. Stewart also instructed them "not to tell what happened and to say that [Gordon] was a smoker[.]" Barber testified that Gordon did not want her to stop at a hospital, explaining that Gordon "was listening to them, listening to what they said," and that Gordon wanted to "wait it out."
 

 ¶ 55. The record reflects that Helene Youngblood, the administrator of Willow Creek Nursing Home, testified that Garner worked at the nursing home from October 2000 through December 2010. Youngblood stated that Garner worked at the nursing home as a cook in the dietary department, and not as a nurse. The jury also heard testimony from representatives from the Mississippi State Board for Massage Therapy and the Mississippi State Board of Medical Licensure stating that Garner was not a licensed massage therapist or nurse. The record also shows evidence seized from Garner's residence included numerous needles, large-gauge syringes labeled "for veterinary use only," ten bottles of superglue, cotton balls, a massage table, and a large container of silicone.
 

 ¶ 56. Nicole Murlowski, a representative from Green Dot Corporation, explained that "[a] Green Dot MoneyPak is used to load cash onto a prepaid debit card, so you then have the ability to purchase and pay and swipe transactions, debit transactions, online transactions." Murlowski testified that every Green Dot transaction and purchase goes through servers in Las Vegas, Nevada, and Los Angeles, California. Murlowski testified that at 11:30 a.m. on March 16, 2012, a MoneyPak pin was purchased at Walgreens and loaded onto an account later that day. Murlowski stated that according to her records, Stewart received the $200 from the Walgreens Green Dot MoneyPak transaction. Shannon Brown, regional operations manager for Regions Bank, also provided testimony that $1,500 in cash was deposited into Garner's account at 4:27 p.m. on March 16, 2012.
 

 ¶ 57. Lee McDivitt, an investigator with the Mississippi Attorney General's Office, testified that he subpoenaed Stewart's and Garner's phone records from AT & T. Investigator McDivitt stated that according to these records, there were a total of sixteen calls between Garner and Stewart on March 15 and 16, 2012. Yehoshua Blauch, an AT & T employee, also testified that Stewart's and Garner's phone records reflected sixteen calls between them on March 15 and 16, 2012.
 

 ¶ 58. The indictment reflects that Garner and Stewart were named as conspirators, and the record reflects sufficient evidence of the elements of the charged conspiracy upon which the jury could find Garner guilty beyond a reasonable doubt.
 
 See
 

 Cowart
 
 ,
 
 178 So.3d at 666
 
 (¶ 41). After reviewing the evidence presented at trial, I submit that the record contains sufficient evidence to show that Garner did conspire with Stewart to commit wire fraud by making a false representation to Gordon that Garner was a licensed nurse,
 when in fact Garner was not a licensed nurse, causing Gordon to transfer $200 to Stewart. I would therefore affirm the judgment of the circuit court.
 

 We recognize that "[a]n out-of-court statement is not hearsay if the statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."
 
 Farris v. State
 
 ,
 
 764 So.2d 411
 
 , 429 (¶ 60) (Miss. 2000) (quoting M.R.E. 801(d)(2)(E) ) (internal quotation marks omitted);
 
 see also
 

 Garrison v. State
 
 ,
 
 726 So.2d 1144
 
 , 1150 (¶ 16) (Miss. 1998) (quoting M.R.E. 801(d)(2)(E) ) (internal quotation marks omitted) ("[A] statement by a co-conspirator of a party during the course and in furtherance of the conspiracy is not hearsay."). We review the trial court's admission or suppression of testimony for an abuse of discretion.
 
 Anderson v. State
 
 ,
 
 62 So.3d 927
 
 , 933 (¶ 13) (Miss. 2011).
 

 The trial testimony reflects the following exchange:
 

 Q. You just told us that you had [Garner's] number; right?
 

 A. She had [Garner's] number. [Garner] gave her the address to the Walgreens. Those addresses, those notes that she wrote down, those address[es] came from [Garner]. We [were] thinking it's the house but it was to the Walgreens.