# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01539-COA

**SHON PIERRE BYRD, JR. A/K/A SHON P. BYRD**  **APPELLANT**
**A/K/A SHON BYRD A/K/A LOCO**

**v.**

**STATE OF MISSISSIPPI**  **APPELLEE**

DATE OF JUDGMENT: 11/02/2017
TRIAL JUDGE: HON. LESTER F. WILLIAMSON JR.
COURT FROM WHICH APPEALED: LAUDERDALE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER
 BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
 BY: BILLY L. GORE
DISTRICT ATTORNEY: BILBO MITCHELL
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 04/09/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

EN BANC.

J. WILSON, P.J., FOR THE COURT:

¶1. Shon Pierre Byrd Jr. was indicted for capital murder, armed robbery, and three counts of credit card fraud in connection with the death and robbery of an elderly man in the parking lot of a Meridian grocery store. Byrd's first trial ended in a mistrial. In Byrd's second trial, the jury deadlocked on the charge of capital murder but found Byrd guilty of armed robbery and three counts of credit card fraud. The court sentenced Byrd to serve forty years for armed robbery and three years for each count of credit card fraud, with the sentences to be served consecutively in the custody of the Department of Corrections.

¶2.    On appeal, Byrd argues (1) that his second trial was barred by double jeopardy; (2) that the trial court abused its discretion by excluding recordings of 911 calls that allegedly supported his theory of defense; and (3) that the jury's guilty verdicts were against the overwhelming weight of the evidence.  We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶3.    On May 11, 2014, eighty-seven-year-old H.L. Putnam was shot and killed as he sat in his car outside Vowell's Marketplace in Meridian.  Putman was shot three times in the chest with a 9 mm pistol.  Police recovered three spent 9 mm projectiles and two casings but never found the gun.  Putnam's wallet was also missing.

¶4.    Putnam had purchased some flowers and groceries from Vowell's shortly before he was killed.  Summer Bowden, a Vowell's cashier, testified that she noticed a $100 bill in Putnam's wallet as he checked out.  Moments after Putnam left the store, Bowden heard gunshots and saw someone running across the parking lot.  She did not see any vehicle at the time she heard the gunshots.  At trial, she identified Shon Byrd as the person she saw running across the Vowell's parking lot.

¶5.    Police had previously shown Bowden two photo lineups: one on the day of the shooting and another four months later.  Bowden identified a possible suspect from the first photo lineup but did not identify the same man in the second photo lineup.  Instead, in the second photo lineup, she identified Byrd as the person she saw running across the parking lot. Byrd's photo had not been included in the first photo lineup. Despite her initial mistaken identification, Bowden was confident at trial that Byrd was the person she saw running.

¶6.    Several other Vowell's employees and customers testified.  One customer said that immediately after the shooting, he saw a young man running away from the store who appeared to be carrying something heavy in his pocket.  Another customer testified that he saw a young black man running through the parking lot after the shooting.  A Vowell's employee who was in the parking lot heard gunshots and then saw a black man running toward Shumate Road with a gun in his hand.  A woman in the parking lot heard gunshots, and she saw a white Mercury Marquis moving slowly through the parking lot, but she could not see the car's occupants.  However, none of these witnesses saw the actual shooting, nor were they able to identify the person they saw running.

¶7.    Kirby Clay was in the parking lot on a lunch break at the time of the shooting.  He testified that he heard a "commotion" and saw a white Mercury Grand Marquis or Lincoln Crown Victoria near the "commotion."  The car was parked with its driver's door open. Clay saw someone wearing gym shorts and a t-shirt approaching the car.  Clay ran inside when he heard the shots and did not see the shooting.

¶8.    Jason Dyess was walking out of the store when he heard gunshots and saw people running.  Dyess testified that he saw a young black man running from the scene wearing a black shirt and black shorts.  He also saw a white car driving slowly toward the man running from the scene.  Dyess left Vowell's and drove in the same direction as the white car.  He saw the car stopped on Shumate Road and saw one of the car's doors closing, although he was not able to see anyone getting in or out of the car.  Dyess called 911 and provided the car's license plate number.  He then returned to the Vowell's parking lot to tell the police

what he had seen.

¶9.     Investigator Kevin Boyd determined that the license plate number provided by Dyess matched a white Grand Marquis registered to Delphine Pritchard. Boyd and two other detectives went to Delphine's home, and she told them that her son DeCarlos Clark had been driving the car that day. Boyd obtained information that DeCarlos could be found across the street at Lyndell Pritchard's[1] house, and police obtained a search warrant for Lyndell's house. Police had no evidence that Lyndell was involved in the homicide/robbery. When police went to Lyndell's house, they found Byrd and Clark, and both were taken in for questioning.

¶10.    While the police were interviewing Byrd and Clark, one officer noticed that Byrd was wearing an ankle monitor, which indicated that he might be on probation of some sort. They later determined that Byrd had been placed on probation by the Lauderdale County Youth Court. Al Moore, who supervises youth court probationers for Lauderdale County, testified at trial, and reports showing the location of Byrd's ankle monitor between 11 a.m. and 12:59 p.m. and between 1:30 p.m. and 5:08 p.m. on May 11, 2014, were admitted into evidence. Moore explained that the monitor transmitted a location signal every five minutes and was generally accurate within 100 feet. The records indicated that Byrd was in the area of Vowell's from 12:33 to 12:38 p.m. The records indicated that Byrd moved from Vowell's toward Delphine's house between 12:38 p.m. and 12:59 p.m. Finally, the records showed that Byrd was in the area of the Bonita Lakes Mall around 3 p.m.

¶11.    Veronica Ferguson testified that she was at Delphine's house on May 11, 2014, when

---

[1] Lyndell is Delphine's son and Clark's half-brother.

4

Delphine asked her to go get some bread. Ferguson asked Clark for a ride, and she testified that Byrd asked to go with them. Ferguson said that Byrd had been across the street at Lyndell's house. Lyndell was Ferguson's boyfriend.

¶12. Ferguson testified that she, Clark, and Byrd drove to Vowell's, which was about four miles from Delphine's house. Clark drove the white Mercury Grand Marquis. They did not discuss any crime on the way to Vowell's, but as they pulled into the parking lot, Byrd said he saw "a lick." Ferguson testified that "a lick" meant "seeing something you want and deciding to get it," whether by legal or illegal means. She testified that, at first, she thought that Byrd was going to steal something from the store. She denied any prior knowledge that Byrd was going to commit a specific crime, and she testified that she told Byrd not to do it. Clark slowed the car, and Byrd got out before the car came to a complete stop, four or five cars away from Putnam. Ferguson told Clark to leave or else she would walk home. Clark drove away, but as they were leaving, Ferguson heard three or four gunshots. She did not see Byrd shoot Putnam, and she said that she had not seen Byrd with a gun.

¶13. Ferguson testified that when Clark stopped at a stop sign, Byrd ran up and got back inside the car. Ferguson asked Byrd if he had killed someone. Byrd replied, "What do you think?"

¶14. When Ferguson returned to Delphine's house, she told Delphine what had happened, and Delphine called the police. Clark and Byrd soon left Delphine's house in Clark's car and went to get Lyndell's car, a Chevrolet Impala, which was out "in the country." Clark and Byrd returned about half an hour later, this time in Lydnell's Impala. The police were at

5

Delphine's house looking for the Grand Marquis and Lyndell, but neither was there.

¶15. After the police left, Ferguson, Clark, and Byrd went to the Bonita Lakes Mall. Clark and Byrd bought something at Hibbett Sports, and Ferguson and Clark bought something at American Eagle. They all used a credit card that Byrd provided. According to Ferguson, Byrd told them that his uncle had sent him the card. Ferguson testified that she did not associate the credit card with the shooting at Vowell's because Byrd did not suggest the shopping trip until sometime later.

¶16. Ferguson was later charged as an accessory to armed robbery and with three counts of credit card fraud. She maintained that she was innocent of those charges because she had no prior knowledge of Byrd's plan to rob and kill Putnam and because she did not know that the card she used at the mall was stolen. She testified that she reached an agreement with the State under which she would receive probation if she testified truthfully. At the time of trial, she was pregnant with Lyndell's child.

¶17. Clark also testified at trial. He testified that he and Ferguson were about to go to Vowell's to buy bread when Byrd asked if he could come with them. They left Delphine's house in the white Mercury Grand Marquis. As they pulled into the parking lot at Vowell's, Byrd excitedly asked, "Ooh, y'all see what I see?" Clark asked what he was talking about, and Byrd said, "A lick." Clark thought Byrd wanted to steal something, and he told Byrd that he was not interested.

¶18. Byrd got out of the car before it came to a complete stop. Clark and Ferguson pulled away to park. Clark then heard gunshots, and he and Ferguson ducked. At first, Clark

6

thought some rival gang members might have been shooting at them. Clark looked up and saw Byrd running toward the car. Clark locked the doors to prevent Byrd from getting in, and Byrd ran from the parking lot.

¶19. Clark and Ferguson left the parking lot. When they stopped at a stop sign, Byrd ran up and jumped in the car. Clark claimed that there was a mechanical issue with the car's door locks, because he was certain that he had locked the doors while they were still in the Vowell's parking lot. Clark asked what had happened, and Byrd told Clark that he had shot four times into the air. Byrd did not explain why he had done that. Clark testified that he never saw Byrd with a gun in the car, but he had seen Byrd with a pistol earlier that day.

¶20. Clark drove to Delphine's house. When they got there, Byrd jumped out of the car and ran away. Ferguson walked over to Lyndell's house. Clark went inside Delphine's house, and she asked "what was all that shooting about." Clark told her that he did not know, but he did tell her that the shooting started after Byrd had gotten out of the car.

¶21. Later that afternoon, Byrd returned to Delphine's house and asked to use Clark's car to go to the mall. Byrd said that his "folks" had given him a credit card, and he wanted to buy something for Mother's Day. Before going to the mall, Clark, Ferguson, and Byrd drove to the country and swapped the Grand Marquis for Lyndell's Chevy Impala because Lyndell wanted his car back. Clark explained that he took his car to the country to hide it from rival gang members and "the repo people." Clark said that Lyndell's Impala was in the country because Clark had taken it there the last time he picked up his Grand Marquis.

¶22. Clark wanted to go home after they got Lyndell's car, but Ferguson wanted to go to

7

the mall before it closed. At the mall, Ferguson did most of the shopping. For the most part, Clark sat outside the stores while Ferguson and Byrd used the credit card to shop. Clark admitted that he did use the card at TJ Maxx. Clark claimed that he did not know that the card was stolen until Delphine called and told him that the police were looking for him and wanted to talk to him about a murder and armed robbery.

¶23. Clark pled guilty to two counts of credit card fraud and as an accessory after the fact to armed robbery. He was sentenced to concurrent terms of five years, three years, and three years. Clark testified that his only agreement with the State was to tell the truth, and he denied any motivation to implicate Byrd in the homicide/robbery. He admitted that there were inconsistencies between his prior statements to police and his trial testimony, but he said his trial testimony was the truth. In his initial statement on the day of the shooting, Clark did not identify Byrd as the shooter. In his statement three days later, he said Byrd had been the shooter. Clark claimed that his initial statement was typed up incorrectly and that the police had not given him enough time to review it before he signed it. Clark testified that Lyndell was not involved in the robbery.

¶24. After the State rested its case in chief, Byrd sought to introduce recordings of four 911 dispatch calls from the day of the shooting. Byrd argued that the recordings suggested that Lyndell was the initial suspect in the shooting. The trial judge allowed the jury to hear only one of the recordings. In that recording, the dispatcher told a law enforcement officer that a car seen at the crime scene was connected to Lyndell and that Lyndell was a suspect.

¶25. Byrd's mother testified that two days before the shooting, he had come home drunk

and slept all day on Saturday, May 10. She testified that Byrd still seemed disoriented and confused when he woke up on May 11. She last saw Byrd when he left the house around 11 or 11:30 a.m. on May 11. She did not see him again until after he had been taken to the police station. Byrd did not testify in his defense.

¶26. Michelle Joyner testified for the State in rebuttal. Joyner was responsible for monitoring Lyndell's location via ankle monitor. On the day of the shooting, Lyndell was on house arrest as a result of contempt of court charges related to misdemeanor charges in municipal court. Joyner testified that Lyndell's monitoring records indicated that he was either at his house or at Delphine's house all day on May 11. Lyndell was not at Vowell's at the time of the robbery. The lead investigator in the case, Greg Crain, was also called in rebuttal, and he testified that the police never uncovered any credible evidence to connect Lyndell to the homicide/robbery at Vowell's. Crain testified that the police searched Lyndell's house only because they believed that Clark might be found there.

¶27. The jury found Byrd guilty of armed robbery and three counts of credit card fraud. However, the jury deadlocked on the capital murder charge, and the trial court declared a mistrial on that charge. The court subsequently sentenced Byrd to serve forty years for armed robbery and three years for each count of credit card fraud, with the sentences to be served consecutively in the custody of the Department of Corrections. Byrd filed a motion for a judgment notwithstanding the verdict or a new trial, which was denied, and then appealed.

## ANALYSIS

¶28. Byrd raises three issues on appeal. First, he argues that his second trial was barred by

9

double jeopardy because of the mistrial declared in his first trial. Second, Byrd argues that the trial court should have allowed the jury to hear all of the recordings that indicated that Lyndell was a suspect in the robbery. Third, Byrd argues that the jury's guilty verdicts were against the overwhelming weight of the evidence. For the reasons that follow, we find no error and affirm.

### I.      Double Jeopardy

¶29.    During Byrd's first trial, the State subpoenaed Al Moore to testify about Byrd's movements on May 11, 2014. The State identified Moore and disclosed his anticipated testimony in discovery prior to trial. After trial started but before Moore was called as a witness, the Lauderdale County Youth Court became aware that Moore had been subpoenaed to testify in Byrd's trial. The youth court judge informed Moore that he could not testify without an order from the youth court authorizing him to testify. The youth court judge then entered an order allowing Moore to testify about the data transmitted from Byrd's ankle monitor on May 11, 2014. The youth court judge delivered the order to the State during trial.

¶30.    Byrd's attorney, Mr. Helmert, moved for a mistrial and, in the alternative, asked the court to exclude Moore's testimony. Helmert stated although he knew from discovery that the State would attempt to introduce this evidence, he also believed that laws related to the confidentiality of youth court proceedings prevented such use of the evidence.[2] He planned to object if the State attempted to introduce the evidence at trial without an order from the youth court. Helmert had entered an appearance in Byrd's youth court case so that he would

_____

[2] *See* Miss. Code Ann. § 43-21-261 (Rev. 2015); *Yarborough v. State*, 514 So. 2d 1215, 1216-19 (Miss. 1987).

10

receive notice if the State requested authorization from the youth court, at which point he intended to object. However, the youth court entered an order allowing Moore to testify without notice to Helmert. Helmert argued that the youth court's ruling without notice to him deprived him of the opportunity to oppose the authorization, and he argued that the circuit court should either declare a mistrial or exclude the evidence.

¶31. After considering the arguments of counsel, the trial judge concluded that "it would be unfair under the circumstances to allow" Moore to testify. Therefore, the judge decided to exclude Moore's testimony. Further discussion ensued at a bench conference, which was not transcribed. After the bench conference, the judge stated on the record that the State believed that the jury should hear Moore's testimony and, thus, the State wanted an opportunity to "sort[] out" its admissibility. The judge further stated,

> [T]he State feels like . . . Mr. Helmert's Motion for a Mistrial should be granted, and the matter will be rescheduled, and we'll start all over with the trial next available date. *I asked Mr. Helmert what his position about that was. He said it's up to the Court, got no problem with doing that.*

(Emphasis added). The court subsequently entered a written order stating that Byrd had "moved for a mistrial or in the alternative that [Moore] be prohibited from testifying." The order further stated that, "after conferring with counsel for the State and the defendant," the court granted the defendant's motion for a mistrial "without objection by either party."

¶32. Prior to his second trial, Byrd moved to dismiss the indictment on double jeopardy grounds. Byrd argued that his motion for a mistrial in the first trial effectively became the State's motion once the State joined in the motion. Byrd also argued that the State had "goaded" him into asking for a mistrial by waiting until trial was underway to obtain an ex

11

parte order from the youth court. In a "Statement of Facts" submitted in support of his motion, Byrd specifically acknowledged that he had "joined in" the State's request that the court grant a mistrial rather than exclude Moore's testimony.

¶33. At a pretrial hearing on Byrd's motion, Youth Court Judge Frank Coleman testified that prior to Byrd's first trial, he learned that Moore planned to testify for the State but that no order had been entered authorizing Moore's testimony. Judge Coleman told Moore that he could not testify without such an order. Judge Coleman then contacted the district attorney's office and told them that they needed an order authorizing the release of Byrd's youth court records before Moore could testify. After discussing the issue with the district attorney's office, Judge Coleman entered an order allowing the limited release of Byrd's youth court information. He did not know that Helmert had entered an appearance in the youth court case, but he said that it was not necessary to notify Helmert before he entered the order. Judge Coleman testified that the district attorney did not do anything illegal or improper by obtaining the order. After the mistrial in Byrd's first trial, Judge Coleman held a hearing on the issue and considered Byrd's objections to allowing Moore to testify. However, Judge Coleman ruled that Moore could testify at Byrd's retrial.

¶34. The trial judge denied Byrd's motion to dismiss. The judge explained that "[t]he only party that ever asked for a mistrial [was Byrd]." The judge recounted that, after he excluded Moore's testimony and the State then withdrew its opposition to a mistrial, he specifically asked Helmert, "Is that still what you want [i.e., a mistrial]?" Helmert confirmed that he still wanted a mistrial. The judge stated, "I gave that decision to you, [Helmert], and you expressed your opinion on what you wanted. I granted *your* motion." (Emphasis added).

12

In addition, the trial judge found that "[t]here was no bad faith or prosecutorial misconduct" in connection with the mistrial. Rather, the judge found that the prosecution made a "mistake" in overlooking a "statutory procedure" for obtaining Moore's testimony. As there was no bad faith or misconduct, the judge found that the Double Jeopardy Clause did not bar Byrd's retrial.

¶35. On appeal, Byrd claims that the trial judge erred by denying his motion to dismiss. Byrd argues both (1) that there was no "manifest necessity" requiring a mistrial in his first trial and (2) that the State "goaded" him into moving for a mistrial. We address Byrd's arguments in turn below.

¶36. The United States Constitution and the Mississippi Constitution both protect criminal defendants from being placed in "jeopardy" twice for the same offense. The Fifth Amendment to the United States Constitution provides in relevant part: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." The Mississippi Constitution states: "No person's life or liberty shall be twice placed in jeopardy for the same offense; but there must be an actual acquittal or conviction on the merits to bar another prosecution." Miss. Const. art. 3, § 22. Comparing the language of these two provisions, the Mississippi Supreme Court recently reiterated that "the federal constitutional right is broader, attaching even if the first trial is not completed." *Montgomery v. State*, 253 So. 3d 305, 310 (¶22) (Miss. 2018) (quotation marks and brackets omitted). We are, of course, bound to follow the broader federal rule in deciding this case. *See Jones v. State*, 398 So. 2d 1312, 1314 (Miss. 1981); *Benton v. Maryland*, 395 U.S. 784, 794 (1969) (holding that "the double jeopardy prohibition of the Fifth Amendment . . . should apply to the States

13

through the Fourteenth Amendment").

¶37.    Whether a criminal defendant may be tried again after a mistrial depends in large part on who asked for the mistrial in the first trial. "If a mistrial is granted upon the court's motion or upon the State's motion, a second trial is barred because of double jeopardy, unless taking into consideration all the circumstances there was a 'manifest necessity' for the mistrial." *Jenkins v. State*, 759 So. 2d 1229, 1234 (¶18) (Miss. 2000). Our Supreme Court has stated that "there is no simple rule or formula for determining what constitutes a manifest necessity to declare a mistrial." *Id.* at 1235 (¶25). It is in the trial court's "sound discretion to determine the necessity of declaring a mistrial," and the trial court's "reasons as stated for the record will be accorded the greatest weight and respect by an appellate court." *Id.* at (¶24) (quoting *Jones*, 398 So. 2d at 1318).

¶38.    As noted above, Byrd argues his second trial was barred because there was no "manifest necessity" for a mistrial in his first trial. However, we agree with the trial judge that the manifest necessity standard does not apply. In Byrd's first trial, the court granted *Byrd's* motion for a mistrial. Byrd's motion did not become the State's motion simply because the State acquiesced in it. Indeed, the trial judge made clear on the record that he was granting *defense counsel's* motion for a mistrial. If Byrd had changed his mind about wanting a mistrial, he should have said so and objected to the judge's ruling granting a mistrial and dismissing the jury. Far from objecting, Byrd's attorney actually confirmed to the trial judge that he still wanted a mistrial. Because a mistrial was granted on Byrd's

14

motion, the "manifest necessity" standard is inapplicable.[3]

¶39.   When, as in this case, the first trial was aborted on the defendant's motion for a mistrial, "quite different principles come into play." *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982).  When the defendant moves for a mistrial, "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Id.* at 675-76.  This is because the "defendant's motion for a mistrial constitutes a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *Id.* at 676 (quotation marks omitted).  Therefore, in general, a mistrial granted in response to a defense motion does not bar a second trial. *Id.*  "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.*  This standard "calls for the [trial] court to make a finding of fact." *Id.* at 675; *accord Davenport v. State*, 662 So. 2d 629, 632 (Miss. 1995) (noting that such a claim is "subject to proof and a finding of fact by the [trial] court").

¶40.   In this case, as the trial judge found, there is no evidence that the State called Moore

---

[3] *See Jenkins*, 759 So. 2d at 1232-34 (¶¶9-17) (holding that the case would "be reviewed on appeal as a grant of the criminal defendant's motion for a mistrial" because the defendant initially moved for a mistrial and, after a delay and further argument by both sides, there was "no indication that the defense objected to the grant of the mistrial at the time it was finally granted"); *Carter v. State*, 402 So. 2d 817, 819-22 (Miss. 1981) (evaluating the mistrial as one requested by the defendant even though the State did not oppose and ultimately "acquiesced" in the defendant's motion).

to testify with the intent of "goading" Byrd into moving for a mistrial. The State disclosed Moore's identity and his anticipated testimony in discovery, and it is clear from the record that the State subpoenaed him because it wanted him to testify—not to provoke a mistrial. The record supports the trial judge's findings that the State did not intend to provoke a mistrial and did not engage in any bad faith or prosecutorial misconduct. Rather, as the trial judge found, the State made what was at worst a good faith "mistake" by overlooking a statutory procedure for obtaining Moore's testimony.[4] Therefore, the trial court correctly denied Byrd's motion to dismiss.

## II.     911 Calls

¶41.    At trial, Byrd attempted to introduce recordings of four phone calls to the Lauderdale County 911 department. The department's director, Jared Stanley, testified about the recordings outside the presence of the jury. After listening to the first call, Stanley testified that he recognized the voice of the dispatcher, a woman who no longer worked for the county. Stanley did not recognize the voice of the caller, although the man identified himself as a Meridian police officer. The dispatcher and caller discussed that a car seen at the crime scene was connected to Lyndell. The dispatcher stated, "We think [the shooter] may be

---

[4] On appeal, neither Byrd nor the State addresses the question whether a pretrial order from the youth court was, in fact, necessary for Moore to testify. The State seems to concede that such an order was needed, and Byrd simply assumes the same. *But see Yarborough*, 514 So. 2d at 1216-19 (holding in different circumstances that the circuit court was not required to insist on "presentation of a ticket from the youth court before" allowing youth court testimony to be used for impeachment). We may decide the appeal on the parties' shared assumption that the order was needed because there is ample evidence to support the trial judge's finding that the State's failure to obtain the order was, at worst, a good faith mistake. Therefore, it is unnecessary for us to address the antecedent evidentiary issue.

16

Lyndell Pritchard." The court overruled the State's objection that the statements on the recording were hearsay and speculation. Thereafter, the recording was admitted into evidence and played for the jury.

¶42. After listening to the second call, Stanley again identified the dispatcher but could not identify the caller. The dispatcher stated that law enforcement thought that Lyndell was the shooter. Stanley could not speak to the basis for the dispatcher's statement, but he testified that the dispatcher still worked for the county and was available to testify. The State objected to the recording as hearsay and speculation, and the court sustained the objection.

¶43. The dispatcher in the third call was the same as in the second call, but Stanley again could not identify the caller. The dispatcher asked if Lyndell was "going to be" a suspect, and the caller said he had "no idea." The State again objected, arguing that the statements were speculation, and the court sustained the objection.

¶44. The dispatcher in the fourth call was the same as in the first call. Stanley could not identify the caller. The dispatcher stated that "they" believed that Lyndell was the "suspect." The dispatcher also identified the suspect's car as a white Mercury that was connected to Lyndell. Stanley did not know the basis of the dispatcher's statements. The court sustained the State's objection to this recording as well.

¶45. The trial judge summarized his rulings on the four recordings by stating that it was "relevant" what law enforcement knew or believed about the shooting and who they identified as a suspect. However, the suspicions or statements of unidentified persons had no probative value. On appeal, Byrd argues that all of the recordings were relevant because they supported his theory that Lyndell was the shooter.

17

¶46.   "We review the admission or exclusion of evidence under an abuse-of-discretion standard." *Fulgham v. State*, 46 So. 3d 315, 326 (¶30).  The trial judge's ruling will be affirmed unless it is so arbitrary or clearly erroneous as to be an abuse of discretion. *Chaupette v. State*, 136 So. 3d 1041, 1045 (¶7) (Miss. 2014).  Moreover, we will reverse only if the exclusion of the evidence resulted in prejudice or adversely affected the defendant's substantial rights.  *Id.*

¶47.   Evidence is relevant if it has any tendency to make a material fact more or less probable than it would be without the evidence.  *See* M.R.E. 401.  In general, relevant evidence is admissible, while irrelevant evidence is inadmissible.  *See* M.R.E. 402. However, the trial judge has discretion to exclude relevant evidence if it is needlessly cumulative and has minimal probative value.  *See* M.R.E. 403.

¶48.   The trial judge did not abuse his discretion by excluding three of the four proffered recordings.  There was ample evidence that the presumed getaway car was connected to Lyndell.  The jury also heard in the first recording that, in the immediate aftermath of the shooting, Lyndell was considered a suspect.  The trial judge reasonably concluded that the additional "chatter" and suspicions of unknown persons in the other recordings were not relevant.  In the language of Rule 401, the additional chatter did not make the fact that Byrd was trying to prove—that Lyndell was the shooter—any "more or less probable than it would be without the evidence."  M.R.E. 401.  The trial judge's ruling was not an abuse of discretion.[5]

---

[5] Because the trial judge did not abuse his discretion by excluding the statements as irrelevant, we need not address whether the statements are also inadmissible hearsay.

### III. Weight of the Evidence

¶49.     Lastly, Byrd argues that the trial judge should have granted his motion for a new trial because the jury's guilty verdicts were against the overwhelming weight of the evidence. We review the trial judge's denial of a new trial for an abuse of discretion. *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). We give deference to the trial judge's ruling because he or she is in a "superior position" to observe the witnesses and evaluate the evidence. *Id.* at 291-92 (¶¶17-18). Moreover, we must "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 289 (¶1). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.*

¶50.     Byrd argues the jury's guilty verdicts were against the overwhelming weight of the evidence because they rest heavily on the testimony of Clark and Ferguson. He argues that both Clark and Ferguson were motivated to lie because they had benefitted from plea bargains. In addition, Byrd argues that both Clark and Ferguson had a motive to exculpate Lyndell, as Lyndell was Clark's brother and the father of Ferguson's child. Finally, Byrd points to certain inconsistencies in the specifics of Clark's and Ferguson's testimonies.

¶51.     We hold that the trial judge did not abuse his discretion by denying a new trial. Again, "[i]ssues of witness credibility are properly resolved by the jury." *Cowart v. State*, 178 So. 3d 651, 667 (¶44) (Miss. 2015). The testimony of a single accomplice may be sufficient to convict the accused unless it is *both* "uncorroborated" *and* "unreasonable, self-contradictory, or substantially impeached." *Id.* In this case, two accomplices implicated Byrd—not

Lyndell—in the shooting and robbery. Their testimony was corroborated by data transmitted from Byrd's and Lyndell's respective ankle monitors, which showed that Byrd was near Vowell's at the time of the shooting and near the mall at the time of the credit card purchases, while Lyndell was at home all day. Moreover, although Byrd identifies some inconsistencies between Clark's testimony and Ferguson's testimony, neither witness's testimony was so "unreasonable, self-contradictory, or substantially impeached" as to be unworthy of belief. *Id.* Clark and Ferguson were thoroughly cross-examined, and the court instructed the jury to "consider their testimony with great caution and suspicion." The jury was entitled to listen to these witnesses and find that the material points of their testimony was credible. That is the jury's role. It is not the role of an appellate court to reweigh the evidence, reassess the credibility of witnesses, or second-guess the jury's verdict. The verdict was not against the overwhelming weight of the evidence. Therefore, the trial judge did not abuse his discretion by denying Byrd's motion for a new trial.

## CONCLUSION

¶52.    Byrd's first trial ended in a mistrial because he requested one, and there is substantial evidence to support the trial judge's finding that the State did not "goad" Byrd into that request. Therefore, the Double Jeopardy Clause did not bar Byrd's second trial. At Byrd's second trial, the trial judge did not abuse his discretion by excluding recordings of speculative and cumulative 911 calls. Nor did the trial judge abuse his discretion by denying Byrd's post-trial motion for a new trial.

¶53.    **AFFIRMED**.

      **BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL,**

20

**McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**